**UNITED STATES of America**

v.

**Olawale JEGEDE**

**No. CR. DKC 03–0344.**

United States District Court,
D. Maryland.

Dec. 8, 2003.

John Michael McKenna, William Collins Brennan, Jr., Brennan Trainor Billman and Bennett LLP, Upper Marlboro, MD, for Defendant.

Hollis Raphael Weisman, Office of the US Attorney, Greenbelt, MD, for Plaintiff.

## MEMORANDUM OPINION

CHASANOW, District Judge.

This case is before the court on the appeal of the United States of America from the decision of Magistrate Judge Day granting Defendant's motion to suppress.

### I. Background

Olawale Jegede, Appellee, was charged with Driving Under the Influence of Alcohol, Driving While Intoxicated, Refusing to Take a Chemical Test, and Failure to Have License With Him, based on a traffic stop on November 30, 2002, at nearly midnight. At the beginning of the proceedings on

June 9, 2003, he moved to suppress orally, contending that the stop was invalid. In court proceedings that day, Officer Simeon Klebaner of the United States Park Police testified about his participation in the stop. He said that he received a report from his dispatcher that was a "cell phone call transfer from Metropolitan Police" to the effect that:

> a taxi with a D.C. license plate of H86392 was traveling up the parkway and that there was a naked male, or had been a naked male, in the rear of the taxi. And he was possibly assaulting a female.

Paper 7 at 7–8, lines 24–25, 1–2. He then stopped the vehicle. Officer Klebaner never saw the cell phone caller. The officer could not tell how many people were in the car until after it was stopped. Only one person was in the car, so the officer concluded that, if there had been an assault, the victim had since left the car. He had not observed any erratic driving or speeding. The sole basis for the stop was the information transmitted from dispatch.

As part of cross-examination, a tape recording was played that revealed that the actual dispatch was as follows:

> ... you got a suspicious-driving D.C. taxicab. It's going to be a tag of Hotel 86392, northbound north of, correction, south of 410 at this time, suspicious activity.
>
> \*  \*  \*  \*  \*  \*
>
> what's suspicious about the activity, please? More specific.
>
> Possible indecent exposure.

Paper 7 at 23, lines 17–25. The taped transmission also informed the officers that the cell phone caller was behind the taxi in a blue Ford Escort with its hazard lights flashing. Hearing the tape played refreshed Officer Klebaner's recollection about what he actually heard from dispatch and what he knew at the time he stopped Appellee's taxi. Officer Klebaner also testified that he later found out the name, address, and telephone number of the caller, who stopped at the scene and was interviewed.

Because the government had not had an opportunity to prepare fully for the issue, including making sure that all tape recordings of the radio transmissions had been produced, the hearing was continued until July 17, 2003.

At the continued hearing, Sergeant Fennelly testified to his participation. After hearing the dispatch, he saw the taxi fitting the description being followed by the Ford Escort with four-way flashers on. After both cars stopped, he went back to speak with the complainant who had called in, and the woman who was also in his car.

The complainants relayed to him that, in northeast Washington, D.C., they saw the taxicab pulled over and saw Appellee climbing out of the cab and pulling his pants up. They thought he might have just finished having sex in the back seat, but they did not see anyone else. They feared that there was a young lady in the cab. They followed it and called the police. Sergeant Fennelly relayed that information to Officer Klebaner within minutes of the stop.

An additional recording was played, which contained the call from the Metropolitan Police to the Park Police as well as the dispatch transmission from the Park Police to the stopping officers that had been played at the first hearing.[1] The

---

1. The transcript contains the following passage: "MR.: U.S. Park Police Communications, James." and "MS.: Yes, Park Police, this is Metropolitan Police." Sgt. Fennelly described this as "a conversation between the dispatch center for the Metropolitan Police Department and our dispatch center." He identified the Park Police dispatchers who appear on the transcript as Jack James and Dispatcher Bresard.

first portion of the call indicated that a citizen was following a cab whose driver was naked, and that a person was in the back of the cab. The police had a cell phone number to call back. This portion of the transmission also included information that the taxi was traveling at 70 or 75 miles per hour, and then up to 80 miles per hour.[2]

Judge Day found that Officer Klebaner received information from dispatch, which in turn was based on a telephone citizen report from a person who was following Appellee on the Baltimore Washington Parkway northbound.

Officer Klebaner stopped the vehicle, identified the driver as the Defendant. He made no observations of bad driving and Appellee was the only person in the vehicle. After the stop, the officer saw fecal material on rear floor and asked Appellee if someone else was or had been riding with him. Appellee said he had relieved himself in a plastic bag. Then Officer Klebaner detected an odor of alcohol upon defendant's breath, saw bloodshot, watery eyes, and concluded that Appellee was unsteady on his feet. Appellee also could not produce other identification, though he was asked twice for it.

According to Judge Day, the sole basis for the stop was the information put out by dispatch. Additional information was provided directly by the complainant at the scene, but after the stop. Officer Klebaner ordered Appellee out of the car and had him move to the rear as soon as he walked up to the taxi. He recounted that the audiotape revealed that the dispatch was only for suspicious activity, possibly indecent exposure. Magistrate Judge Day found that there was insufficient corroboration of the portion of the tip relating to criminal activity under *Florida v. J.L.*, 529

U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), and its progeny, and, accordingly, he granted the motion to suppress.

## II.  Standard of Review

Fed.R.Crim.P. 58(g)(2)(D) provides, in part, that "[t]he scope of the appeal [from a magistrate judge's decision] is the same as in an appeal to the court of appeals from a judgment entered by a district judge." The record on appeal consists of the original papers and exhibits in the case, together with any transcript, tape, or other recording of the proceedings and a certified copy of the docket entries. *See* Rule 58(g)(2)(C). In reviewing the decision of the magistrate judge, the court reviews the factual findings for clear error, and the ultimate question of reasonable suspicion *de novo*. *See United States v. Cephas*, 254 F.3d 488, 491 (4th Cir.2001).

## III.  Analysis

■ The Fourth Amendment, which prohibits unreasonable searches and seizures, has been interpreted to permit law enforcement agents to stop a moving automobile briefly "to investigate a reasonable suspicion that its occupants are involved in criminal activity." *United States v. Hensley*, 469 U.S. 221, 226, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). Even when the reason for the stop relates to past, as opposed to ongoing or anticipated, criminal activity, the test remains the same: to "balance[ ] the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Id.*, 469 U.S. at 228, 105 S.Ct. 675 (citing *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)).

---

**2.** The government concedes that the taxi was not stopped for any traffic violation, including speeding.

■ The magistrate judge evaluated this case as if it involved an anonymous tip. It did not. The cell phone caller provided a call back number to the dispatcher and stayed with Appellee's car as it traveled up the highway. The caller continued to provide information to the dispatcher, including a description of his own car and how it could be identified because the four-way flashers were on. Thus, *Florida v. J.L.* is of limited application. Instead, as in *United States v. Quarles,* 330 F.3d 650, 655–56 (4th Cir. 2003), the police could and did readily identify the tipster and were permitted to rely on the information he provided.

■ The real crux of the issue here is whether only the information broadcast to the stopping officers may be considered in evaluating whether there was reasonable suspicion for the stop and, if so, whether there was sufficient basis for the stop. If, on the other hand, all of the information in police hands may be considered, the next question would be, whether then there was reasonable suspicion for the stop.

The case of *United States v. Colon,* 250 F.3d 130 (2d Cir.2001), dealt with the concept of collective knowledge when the 911 operator was a civilian, and not a police officer.

> [B]y not tracing the information back to any person with the training to make a determination of reasonable suspicion and relying instead on the collective knowledge of "the department" generally, the government's argument takes the collective knowledge doctrine too far afield of the reasons underlying its purpose.
>
> A primary focus in the imputed knowledge cases is whether the law enforcement officers initiating the search or arrest, on whose instructions or information the actual searching or arresting officers relied, had information that would provide reasonable suspicion or

probable cause to search or arrest the suspect. *See Hensley,* 469 U.S. at 231, 105 S.Ct. 675 [other citations omitted]. Thus, application of the imputed knowledge doctrine requires that at some point along the line, some law enforcement official—or perhaps some agglomeration of such officials—involved must possess sufficient information to permit the conclusion that a search or arrest is justified.

*Colon,* 250 F.3d at 135–36.

In this case as well, there is no evidence about the qualifications of either the Metropolitan Police or the Park Police dispatcher to make a reasonable suspicion determination. It may well be that these dispatchers, as the one in *Colon,* were civilian and thus not in a position themselves to make the reasonable suspicion evaluation. There is also no evidence that anyone other than the Park Police officers on the scene ever made a decision to stop the taxi. Rather, the dispatch alerted them to the circumstances and they acted solely on the information relayed to them. Thus, any information other than that which was actually disseminated to the stopping officers must be disregarded.

■ The question then becomes whether this tip, indicating that a person in the taxi was suspected of indecent exposure, was sufficient to justify the stop: whether the information that the driver might have committed an indecent exposure in the District of Columbia was reasonable suspicion that sufficiently serious criminal activity had taken place to justify the stop of Appellee for further investigation. Judge Day was concerned that the mere assertion of the conclusion that Appellee had committed indecent exposure was not in any way corroborated by the police, nor could it be while Appellee was driving a moving vehicle. Although one of the stopping officers asked for more detail as to

the nature of the suspicious activity, very little was supplied. No explanation was given as to the basis for any conclusion of indecent exposure, or any of the circumstances that would justify a stop. All the police knew was that an identifiable concerned citizen had phoned in to the police, was still following the taxi, and said that the driver had indecently exposed himself in some fashion in public view in the District of Columbia. No information was provided indicating that dangerous illegal activity was ongoing or again imminent. Indecent Exposure is a misdemeanor under District of Columbia law, carrying a penalty of 90 days in jail, unless knowingly committed in the presence of a minor, in which case the maximum penalty becomes one year in prison. *See* D.C.Code Ann. § 22–1312 (2003).

In *Hensley,* the Court held "that law enforcement officials may conduct a *Terry* stop based upon reasonable suspicion 'that a person they encounter was involved in or is wanted in connection with a completed felony.'" *Quarles,* 330 F.3d at 653. There is some question whether a stop for any past crime not amounting to a felony is or should be permitted. *See* Wayne R. Lafave, 4 Search and Seizure, A Treatise on the Fourth Amendment, § 9.2(b)(c) (3d ed.1996 and Supp.2003) (citing *City of Devils Lake v. Lawrence,* 639 N.W.2d 466 (N.D.2002), as an example of upholding a stop for the minor offense of disorderly conduct). It is clear, however, that evaluating a stop involves a balance of the importance of the governmental interests justifying the intrusion against the nature and quality of the intrusion on personal security.

The factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct. This is because the governmental interests and the nature of the intrusions involved in the two situations may differ. As we noted in *Terry* [*v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)], one general interest present in the context of ongoing or imminent criminal activity is "that of effective crime prevention and detection." *Terry,* 392 U.S. at 22, 88 S.Ct. at 1880. A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop. See *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); ALI Model Code of Pre–Arraignment Procedure 12 (Prop. Off. Draft No. 1, 1972).

*Hensley,* 469 U.S. at 228–29, 105 S.Ct. 675.

It is one thing to uphold a stop on suspicion of a misdemeanor, not committed in an officer's presence, when there is potential for repeated danger, such as weaving or other dangerous driving. It is quite another to uphold a stop for a completed misdemeanor when there is no indication that it will be repeated, or cause danger to others, and particularly when the police have the means to identify the driver.

Here Appellee was driving a taxicab and the license plate number was provided in the initial tip. The facts that the civilian witnesses were sufficiently alarmed by what they saw to call the police and to

continue to follow the taxi obviously justified some response by the Park Police. Once the officers located the taxi, though, and saw no dangerous activity, they could and should have inquired again of the basis for the concern and suspicion of indecent exposure and then made an evaluation of reasonable suspicion and/or continued to observe the taxi to see if other suspicious conduct occurred. If the police concluded that a second person possibly was in distress in the back seat of the taxi, they would have had reasonable suspicion to justify a stop. With only the suggestion, though, that the driver had possibly committed an indecent exposure, they lacked sufficient justification to stop the taxi at the time that they did. While a brief stop for investigation is less intrusive than an arrest, it still constitutes a significant intrusion on a person's security. Appellee was driving in an apparently lawful manner, when he was ordered to pull over and immediately told to get out of his car. It should not have happened on nothing more than a suggestion that he had committed an indecent exposure some time before. It follows that Magistrate Judge Day's decision to suppress the fruits of the stop was correct.

## IV. Conclusion

For the foregoing reasons, the order appealed from will be affirmed.

### ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this 8th day of December, 2003, by the United States District Court for the District of Maryland, ORDERED that:

1. The judgment appealed from BE, and the same hereby IS, AFFIRMED; and

2. The clerk will transmit copies of the Memorandum Opinion and this Order to counsel for the parties and CLOSE this case.