**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

JUSTIN WELLS GRIGG,
          *Defendant-Appellant.*

No. 06-30368

D.C. No.
CR-05-00074-BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
March 6, 2007—Portland, Oregon

Filed August 22, 2007

Before: Ronald M. Gould, Richard A. Paez, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Gould

**COUNSEL**

Thomas Monaghan, Federal Defenders of Eastern Washington and Idaho, Boise, Idaho, for defendant-appellant Justin Wells Grigg.

Aaron N. Lucoff, Assistant United States Attorney, Boise, Idaho, for plaintiff-appellee the United States.

**OPINION**

GOULD, Circuit Judge:

Appellant-Defendant Justin Wells Grigg appeals the district court's denial of his motion to suppress an unregistered automatic firearm that police officers discovered while conducting an investigative stop of Grigg pursuant to a citizen's complaint that Grigg had been playing his car stereo at an excessive volume earlier in the day. We have jurisdiction under 28 U.S.C. § 1291. We reverse the district court's denial of the motion to suppress the firearm and post-arrest statements and remand for further proceedings.

**I**

On April 12, 2005, a grand jury returned a one-count indictment in the United States District Court for the District

of Idaho, charging Grigg with possession of an unregistered firearm, an SKS automatic rifle (machine gun), in violation of 26 U.S.C. § 5861(d). Police officers in Nampa, Idaho had discovered the weapon during an investigatory stop that occurred because they suspected Grigg of playing his car stereo at an excessive volume earlier in the day in violation of a local noise ordinance.

On August 15, 2005, Grigg filed a motion to suppress the firearm and statements that he made after the stop. Grigg claimed that the Nampa police violated his Fourth Amendment rights by conducting a search of his vehicle solely on the basis of suspicion that he had committed a misdemeanor by playing his car stereo at excessive volume earlier in the day. On September 19 and 20, 2005, the district court held a hearing on Grigg's motion to suppress. The following facts were established:

On September 21, 2004, a Nampa resident, Jeffrey Harmel, called the police to report that a car had driven by his house at 710 Dufur Street with its car stereo playing very loudly. Officers Oren McGuire and Mike Roeder of the Nampa Police Department responded independently. Upon Officer McGuire's arrival, Harmel said that "kids" in the neighborhood had been harassing him with loud music for "years," and that he had "caught" the car in question — a Mercury Cougar, the driver of which was Grigg — "booming" music several times in the preceding days, and that on one occasion he had called the police to file a complaint. Although Harmel testified that he did not know whether the police responded to the previous complaint, according to Officer McGuire's testimony, the police had given Grigg a prior verbal warning.

While filling out a formal citizen complaint, Harmel pointed down the street to where the offending car was parked in front of a house at 1800 East Dewey Street. During this conversation, about one minute after Officer McGuire's arrival, Grigg got in the Cougar and drove back toward Har-

mel and Officer McGuire. As Grigg passed, no music could be heard and he was driving lawfully, but Harmel identified Grigg as the subject of his complaint. At that point, although Officer McGuire had not ascertained Grigg's identity or investigated possible prior complaints, McGuire told Officer Roeder, who had arrived, to stop the car to inquire about excessive noise, determine the driver's identity, and serve the driver with a citation and summons. Officer McGuire then completed the complaint form, which Harmel signed, leaving blank the unknown personal information about the subject of the complaint.

On Officer McGuire's instruction, Officer Roeder spotted the Cougar and trailed Grigg. Roeder activated his overhead lights, and Grigg delayed a few seconds before pulling into a driveway. After the stop, Grigg started to get out of his car, but Officer Roeder ordered him back inside. As Officer Roeder approached, Grigg volunteered that he had a "hunting rifle" inside the car that he was taking to get "fixed." Officer Roeder then observed the SKS rifle on the passenger seat along with ammunition and .380 caliber handgun shells. Roeder then initiated a pat down search and arrested Grigg after finding concealed brass knuckles.[1]

At the suppression hearing, Officer McGuire testified that he did not intend to arrest Grigg for the suspected misdemeanor noise violation because under Idaho law he could not arrest a suspect for a misdemeanor not committed in his presence.[2] Officer McGuire testified that he did not inquire with

---

[1]On a motion in limine, the district court later excluded the .380 caliber shells. Although it did not on that motion exclude the brass knuckles, the record contains no indication that the government ever moved to admit them.

[2]*See* Idaho Code Ann. § 19-603 (2007) ("When peace officer may arrest") ("A peace officer may make an arrest in obedience to a warrant delivered to him, or may, without a warrant, arrest a person: [1] For a public offense committed or attempted in his presence; [2] When a person arrested has committed a felony, although not in his presence; [3] When a felony has in fact been committed and he has reasonable cause for believing the person arrested to have committed it . . . .").

dispatch to check whether in making the prior complaint Harmel had given the license number of the Cougar. Officer McGuire testified further that under Nampa Police Department protocol, a record would exist of Harmel's previous complaint, including any prior contact with Grigg and any verbal warning he received. Officer McGuire testified that any specific information included in the log, such as a subject's name and address, would have been provided by the previous complainant. Officer McGuire also testified that it would have been time-consuming to attempt to bring up the log on his patrol car computer, and that he did not want to "bother" dispatch with a noise complaint, which "is not that big of a deal." Officer McGuire further testified that he decided to stop the Cougar because all the parties involved were present. Addressing whether there was an alternate method of identifying the driver, Officer McGuire stated that a call to the dispatch was unreliable because the name of the driver could have been provided only by Harmel, who did not know Grigg's name. Officer McGuire conceded, however, that absent the ability to stop the Cougar directly, a preferred method would have been to return to the address where the Cougar was parked at 1800 East Dewey Street and ask about the driver's identity.

The district court determined that (1) the investigating officers did not know the identity or residence of the driver of the Cougar, (2) the driver was in the process of driving away before the stop, and (3) the officers sought to stop the driver to gain more information about Harmel's noise complaint and identify the driver. The district court rejected the government's proffered alternate theories for the stop: 1) it was not to undertake a citizen's arrest because Harmel had not expressed a desire that the driver be arrested; 2) it was not an attempt to serve Harmel's complaint and a summons on Grigg because Officer McGuire was still in the process of completing the complaint when the Cougar drove past; 3) and the government did not meet its evidentiary burden that Grigg played loud music in the presence of Officer Roeder, which

would have provided probable cause to stop Grigg for a present noise violation. The district court concluded from these findings that Officers McGuire and Roeder conducted an investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968), based on a citizen complaint to gather information on the alleged completed noise violation.

Because the criminal conduct that the officers were investigating had already occurred, the district court held that *United States v. Hensley*, 469 U.S. 221 (1985), applied even though that case concerned an investigatory stop based on reasonable suspicion that the defendant had previously committed a felony (armed robbery). *See id.* at 223, 229. In conducting the balancing test set forth in *Hensley* between the law enforcement interest in crime prevention and an individual's interest in personal security from governmental intrusion, *see id.* at 228, the district court found important that the officers did not know the identity of Grigg and had no certain way of locating him when faced with the likelihood that the driver of the Cougar had committed an excessive noise violation and was leaving the area. The district court rejected Grigg's arguments that the police had other less intrusive means of identifying him — such as requesting specific information from the police logs on Harmel's previous complaint or checking the residence where Grigg had parked his car — due to the unreliability of these sources of information. Although commenting that it was "a very, very close call," the district court held in favor of the government that the stop was a reasonable method of resolving the noise complaint.

After the district court denied Grigg's motion to suppress, the case proceeded to trial, and on November 18, 2005, a jury found Grigg guilty of violating 26 U.S.C. § 5861(d) for knowingly possessing the unregistered SKS automatic rifle. Grigg timely appealed.[3]

---

[3]In this appeal, Grigg challenges the district court's denial of his motion to suppress the firearm and other evidence, and also contends that the trial verdict cannot stand because of prosecutorial misconduct.

## II

The reasonableness of an investigatory stop is reviewed de novo. *See United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1083-84 (9th Cir. 2000). Such a stop must be based on reasonable suspicion under the totality of the circumstances. *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003). Any underlying factual findings are reviewed for clear error. *United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002).

## III

Most of the constitutional principles at play in this appeal are well established. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. Under *Terry* and its progeny, police may, consistent with the Fourth Amendment, stop persons in the absence of probable cause under limited circumstances. *See Dunaway v. New York*, 442 U.S. 200, 207-11 (1979). In particular, law enforcement officers may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975); *United States v. Hartz*, 458 F.3d 1011, 1017 (9th Cir. 2006); *United States v. Sigmond-Ballestero*s, 285 F.3d 1117, 1121-22 (9th Cir. 2002). However, the governmental interest in investigating possible criminal conduct based on an officer's reasonable suspicion may be outweighed by the Fourth Amendment interest of the driver in remaining secure from the intrusion. *See Delaware v. Prouse*, 440 U.S. 648, 654-55 (1979).

[1] An investigatory stop can be undertaken to prevent ongoing or imminent crime, *i.e.*, when a police officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be

afoot." *Terry*, 392 U.S. at 30; *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002). Further, in *Hensley*, the United States Supreme Court held that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a *completed* felony, then a *Terry* stop may be made to investigate that suspicion." 469 U.S. at 229 (emphasis added). The *Hensley* court explicitly confined its analysis to the felony context, leaving open the question whether the rule could be extended to "all past crimes, however serious," *i.e.*, misdemeanors. *Id.* Thus the Supreme Court's *Hensley* decision did not answer the issue tendered by this appeal. Grigg's challenge to the district court's extension of *Hensley* raises an issue of first impression for us.[4]

## A

In *Hensley*, the investigative stop arose after two armed men robbed a tavern in the Cincinnati suburb of St. Bernard, Ohio, and the police department there learned that Hensley was the getaway driver. 469 U.S. at 223. The St. Bernard police department issued a "wanted flyer" that described Hensley and the date and location of the alleged robbery, with a request that other police departments in the Cincinnati metropolitan area pick up and hold Hensley in the event that he were located. *Id.* The flyer warned that Hensley should be considered armed and dangerous. *Id.* Twelve days after the robbery, police officers in Covington, Kentucky, who were familiar with Hensley, noticed him in the driver's seat of a Cadillac and notified dispatch. *Id.* at 223-24. Another pair of Covington officers heard the call, radioed that they had seen the wanted flyer about Hensley, and one of the officers drove

---

[4]Of our sister circuits, only the Sixth Circuit has addressed this issue, stating that the *Hensley* rule did not apply to past completed misdemeanors. *See Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004) ("Police may . . . make a stop when they have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor.").

to an apartment where Hensley was known to stay. *Id.* at 224. When the Cadillac was again spotted, one of the Covington officers pulled over Hensley and, during the stop, discovered a weapon. *Id.* Hensley was arrested for being a convicted felon in possession of a firearm. *Id.* at 225.

Upholding the district court's denial of Hensley's motion to suppress the firearm, the Supreme Court employed a balancing test to weigh "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 225, 228. Acknowledging the differences between investigating past criminal conduct and detecting ongoing or imminent crime, the Supreme Court recognized that the exigencies involved in crime prevention are attenuated in the context of completed past crimes:

> A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop.

*Id.* at 228-29. However, the Supreme Court stressed that the law enforcement interest in solving crime might, in some situations, permit an investigatory stop for a past crime:

> Despite these differences, where police have been unable to locate a person suspected of involvement

in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice. Restraining police action until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large. Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible.

*Id.* at 229.

Grigg argues that *Hensley* is distinguishable on its facts because that case concerned a completed felony, an armed robbery, that presented a significant public safety risk, whereas Grigg's suspected misdemeanor noise violation is a minor nuisance. In urging us to consider the nature of Grigg's purported offense, Grigg contends that the district court erred by not adequately considering the harmlessness of the misdemeanor noise violation and that *Hensley* should not have been extended to validate the *Terry* stop here. The government counters that *Hensley* need not be limited to completed felonies because the interest in locating suspects of past misdemeanors remains of importance in this case and others. Under this interpretation, the government argues that the actions of Officers McGuire and Roeder were constitutional because an investigatory stop of Grigg to identify him as the driver of the Cougar and inquire about his side of the story was, under the circumstances, the best approach to resolve the noise complaint, and thus reasonable under the Fourth Amendment.

**[2]** Whatever may be the conclusion of the analysis, there can be little doubt that the Supreme Court's methodology in *Hensley* applies to the circumstances here where the Nampa police officers undertook an investigative stop to determine

whether Grigg was involved in the past noise violation alleged in Harmel's complaint. *See In re Stern*, 345 F.3d 1036, 1043 (9th Cir. 2003) ("[W]e are bound not only by the holdings of [Supreme Court] decisions but also by their mode of analysis.") (internal quotations omitted; second brackets added by *Stern*). The facts of *Hensley*, however, can be distinguished because that case concerned a completed felony of armed robbery, whereas Grigg's excessively loud music arguably resulted at most in a misdemeanor violation of the local noise ordinance that does not endanger the public.[5] *See Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004) ("Police may . . . make a stop when they have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor.") In *Hensley*, the Supreme Court pointed out the obvious and patent public safety risk in allowing a suspect of armed robbery to remain at large. *See* 469 U.S. at 229. This potential threat of violence created the exigency in *Hensley* to stop the suspect that justified foregoing the Fourth Amendment's warrant requirement. *See id.* ("Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible."). In sharp contrast, it is difficult to imagine a less threatening offense than playing one's car stereo at an excessive volume. The absence of any danger to any person arising from the misdemeanor noise violation here does not support detaining the suspect as promptly as possible.

---

[5]Although the parties and the district court assumed that Grigg's playing of excessively loud music, if true, would have been a misdemeanor violation, the parties do not specify which state or local ordinance might have been transgressed. For the purposes of our analysis, we accept the parties' assumption that a misdemeanor was involved, but we note that Grigg's behavior was arguably so mild that possibly only a civil infraction would have resulted, and not a misdemeanor "crime." However, if a misdemeanor crime it was, the playing of music at excessive volume is surely in a class of relatively innocuous crime, as public safety is not threatened by violation.

**[3]** Although the Supreme Court did not expressly limit its holding, the reasoning of *Hensley* suggests that we may properly consider the gravity of the offense in balancing the interest of crime prevention and investigation against the interest in privacy and personal security when a court assesses the reasonableness of a *Terry* stop. In *United States v. Jegede*, the district court recognized the applicability of the *Hensley* balancing test that included such a focus on the nature of the offense, *see* 294 F. Supp. 2d 704, 708 (D. Md. 2003), where the facts were to some extent analogous to the circumstances here. In *Jegede*, the police had received a telephone complaint from a car following a taxi that observed the taxi stop and the driver get out to pull up his pants, which apparently alarmed the complainant that the driver had been having sex in the back seat or that there was a woman in the car who might have been assaulted. *Id.* at 705. The police dispatch relayed the complaint to an officer in the field, mentioning "possible indecent exposure." *Id.* When the officer later pulled over the taxi driver, who by then was acting lawfully, there was no sign of another person, but the officer detected signs of intoxication on the driver and arrested him. *Id.* at 706. Noting that indecent exposure was only a misdemeanor in Maryland, *id.* at 708, the district court held that the stop was unconstitutional because the concern about criminal conduct by the untrained complainant, filtered through the dispatch, did not provide a reliable basis for an officer's reasonable suspicion to warrant the investigative stop. *Id.* at 709 ("Once the officers located the taxi . . . and *saw no dangerous activity*, they could and should have inquired again of the basis for the concern and suspicion of indecent exposure and then made an evaluation of reasonable suspicion and/or continued to observe the taxi to see if other suspicious conduct occurred.") (emphasis added).

The court in *Jegede* perceived that an exigency of danger must link the past completed misdemeanor conduct to the officer's justification to stop a suspect under *Hensley*. The district court explained:

It is one thing to uphold a stop on suspicion of a misdemeanor, not committed in an officer's presence, *when there is potential for repeated danger*, such as weaving or other dangerous driving. It is quite another to uphold a stop for a completed misdemeanor when there is no indication that it will be repeated, *or cause danger to others*, and particularly when the police have the means to identify the driver.

*Id.* at 708 (emphasis added). The government is correct that the *Jegede* court primarily granted relief to the defendant in that case because of the unreliability of the complaint, but the district court nevertheless reasoned that indecent exposure by its nature has no potential for danger, unlike reckless driving, which might otherwise countenance a reasonable *Terry* stop.

In state court cases addressing the identical or similar factor, the state courts have split, with the decisive issue being the dangerous nature of the underlying misdemeanor that gave rise to the *Terry* stop. In *State v. Duncan*, 43 P.3d 513, 515, 521 (Wash. 2002) (en banc), the Washington State Supreme Court held that police could not initiate a *Terry* stop and frisk after they observed a suspect who might have committed a civil infraction (drinking alcohol in public). The *Duncan* court acknowledged the principle in *Hensley* that the traditional interest in officer safety and crime prevention "may not be present when dealing with past crime." *Id.* at 518 ("The . . . focus on preventing *crimes*, and promoting the interests of justice in arresting *felons* in *Hensley*, suggests that the interest in preventing civil infractions may not be accorded the same weight."). The Washington State Supreme Court also underscored the distinction between felonies and misdemeanors that bears on the delicate balance between public safety and personal security from governmental intrusion:

[T]his court has cited favorably the common law rule requiring a warrant prior to arresting an individual

> for the commission of a misdemeanor. . . . This rule illustrates the higher burden this court imposes upon officers when investigating lesser crimes. Accepting the presumption that more serious crimes pose a greater risk of harm to society, we place an inversely proportional burden in relation to the level of the violation. Thus, society will tolerate a higher level of intrusion for a greater risk and higher crime than it would for a lesser crime.

*Id.* at 518-19 (internal citations omitted).

Likewise, in *Blaisdell v. Comm'r of Public Safety*, 375 N.W.2d 880, 881, 883-84 (Minn. Ct. App. 1985), *aff'd on other grounds*, 381 N.W.2d 849 (Minn. 1986), the Court of Appeals of Minnesota invalidated the stop of a driver who was seen committing a "no-pay" theft from a gas station because it was a misdemeanor that is, by definition, inherently less severe than a felony. In reaching this decision, the appellate court noted

> a legislative recognition that the public concerns served by warrantless misdemeanor arrests are in some degree outweighed by concerns for personal security and liberty. At the very least, because misdemeanor offenses are considered less serious crimes than felonies and because police cannot arrest for misdemeanors unless the offense is committed in their presence, the public concerns served by seizures to investigate past misdemeanors are less grave than the concerns served by seizures to investigate past felonies and gross misdemeanors.

*Id.* For this reason, the appellate court in *Blaisdell* imposed a *per se* rule in Minnesota that *Hensley* is inapplicable to past misdemeanor conduct. *Id.* at 883-84 ("While we can envision situations where an automobile stop could advance the public interest to a greater degree than the present stop, we do not

believe this will arise in a misdemeanor context with suffi-
cient frequency to appreciably advance the public interest in
solving past crimes."); *see also State v. Bennett*, 520 So. 2d
635, 636 (Fla. Dist. Ct. App. 1988) (affirming trial court's
holding that investigative stops involving past misdemeanors
are constitutionally impermissible).

State courts have also applied the *Hensley* test to completed
misdemeanors and reached the opposite conclusion that the
governmental interest in investigating and preventing lesser
crimes does not unduly infringe on personal security under
the Fourth Amendment. In *State v. Myers*, a Louisiana appel-
late court considered the applicability of *Hensley* where the
Louisiana state police stopped the driver of a 1985 gray Lin-
coln Continental believed to have struck a traffic sign across
the border in Arkansas according to a teletype issued by the
Arkansas authorities that gave a matching description of the
car later seen in Louisiana. 490 So. 2d 700, 701-03 (La. Ct.
App. 1986). Although the car was not driving unlawfully
when it reached Louisiana, *id.* at 701, the appeals court held
that the investigative stop was not unconstitutional in light of
the potential hazards related to the offense:

> We have a scenario apparently involving a driver
> who left the scene of an accident. Damage was
> caused, perhaps intentionally, to government prop-
> erty. At the very least, we are dealing with an
> impaired or non-attentive driver who might have
> been dangerous to other traffic. The safety of the
> motoring public and the potential capacity of the
> automobile to inflict serious damage provides a
> fairly strong government interest.

*Id.* at 704 (distinguishing *Blaisdell* because of the differing
degrees of potential public harm and the close temporal prox-
imity of the "past" crime of reckless driving compared to the
two-month time lapse after the "no-pay" theft).

In *City of Devils Lake v. Lawrence*, 639 N.W.2d 466, 467, 473 (N.D. 2002), cited by the government here to support the district court's ruling, the North Dakota Supreme Court confronted a situation where a police officer responded to a call from police dispatch that "a fight was going to begin" at a bar and upon arrival at the scene was told by a witness that the defendant was the one involved in the "verbal altercation." Reversing the grant of the defendant's motion to suppress, the North Dakota high court reasoned that

> [a] law enforcement officer could reasonably infer and deduce from this dispatch, at the very least, the possibility that someone at the bar had engaged in, or was engaging in, 'violent, tumultuous, or threatening behavior' with intent to harass, annoy, or alarm another person within the meaning of [the state disorderly conduct statute], to necessitate a call for police assistance.

*Id.* at 473. Although the North Dakota Supreme Court did not address *Hensley* explicitly, that court was alert to the potential threat arising from a suspected past misdemeanor of disorderly conduct, which favored permitting the investigatory stop to quell the possibility of escalating violence.[6]

---

[6]*See also State v. Burgess*, 776 A.2d 1223, 1227-28 (Me. 2001) (upholding stop without mention of *Hensley* to investigate complaint of previous threat by drunken man to shoot holes in a vehicle if not moved); *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 117 (Miss. 1999) (holding, without citation to *Hensley*, that stop of vehicle reported to have driven recklessly was constitutional and rejecting "felony/misdemeanor distinction . . . [that] would require officers to ignore communications of other officials warning of drivers who may be impaired, ill, reckless, or dangerous to the public"); *State v. Blankenship*, 757 S.W.2d 354, 357 (Tenn. Crim. App. 1988) (holding stop constitutional on report that suspect was involved in hit-and-run accident). Although some of these cases do not rely on *Hensley*, the common rationale to justify the investigative stop of an already completed misdemeanor stems from the exigency of preventing or mitigating public safety risks associated with the nature of the offense.

**[4]** These state cases are instructive because they illuminate the rule we derive from *Hensley* that a court reviewing the reasonableness of an investigative stop must consider the nature of the offense, with particular attention to any inherent threat to public safety associated with the suspected past violation. A practical concern that increases the law enforcement interest under *Hensley* is that an investigating officer might eliminate any ongoing risk that an offending party might repeat the completed misdemeanor or that an officer might stem the potential for escalating violence arising from such conduct, both of which enhance public safety. Conversely, the absence of a public safety risk reasonably inferred from an innocuous past misdemeanor suggests the primacy of a suspect's Fourth Amendment interest in personal security.

**[5]** As a complement to these practical concerns, moreover, the formal distinction between felonies and misdemeanors generally followed under state law in prohibiting warrantless arrests for misdemeanors committed outside the presence of the officer also informs our inquiry.[7] As noted by the court in *Blaisdell*, this formal distinction amounts to "a legislative recognition that the public concerns served by warrantless misdemeanor arrests are in some degree outweighed by concerns for personal security and liberty." *Blaisdell*, 375 N.W.2d at *883; see also Duncan*, 43 P.3d at 518-19 ("Accepting the presumption that more serious crimes pose a greater risk of harm to society, we place an inversely proportional burden in rela-

---

[7]In all states covered by our circuit, except Hawaii and Oregon, the respective state legislatures have observed this distinction by promulgating laws that prohibit an officer, though with some varying exceptions that are inapplicable here, from arresting a person who commits a misdemeanor outside of his or her presence. *See* Alaska Stat. § 12.25.030 (2006); Ariz. Rev. Stat. Ann. § 13-3883 (2007); Cal. Penal Code § 836 (2007); Idaho Code Ann. § 19-603 (2007); Mont. Code Ann. § 46-6-311 (2005) (allowing for warrantless arrest not in the presence of an officer in the event of circumstances involving violence); Nev. Rev. Stat. Ann. § 171.124 (2007) (allowing for arrest for gross misdemeanor committed outside officer's presence); Wash. Rev. Code Ann. § 10.31.100 (2007).

tion to the level of the violation."). In light of this distinction, our evaluation of a *Terry* stop in the context of a completed misdemeanor should tend to give primary weight to a suspect's interests in personal security, while considering the law enforcement's interest in the immediate detention of a suspect is not paramount. Although federal constitutional law is controlling, we note this formal distinction under state law because "[s]tate law is often relevant in analyzing the reasonableness of police activities under the fourth amendment." *Reed v. Hoy*, 909 F.2d 324, 325, 330 & n.5 (9th Cir. 1990) (examining reasonableness in context of § 1983 and claim of qualified immunity); *see also Bingham v. City of Manhattan Beach*, 341 F.3d 939, 950 (9th Cir. 2003) ("In evaluating a custodial arrest executed by state officials, federal courts must determine the reasonableness of the arrest in reference to state law governing the arrest." (internal quotation marks and alteration omitted)).[8]

---

[8]Consideration of the nature of the offense under *Hensley* is also consistent with the Fourth Amendment reasonableness inquiry in the context of a warrantless entry into a home of a person suspected of a non-jailable traffic offense. *See Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984). In *Welsh*, the arrest occurred after a witness observed a car swerve into an open field and called the police. *Id.* at 742-43. When the witness told the police that the car's driver walked away from the accident, the police checked the car's registration, determined that Welsh lived nearby, and presently gained entry to his house without a warrant and arrested him for driving while intoxicated. *Id.* Rejecting the government's exigency theories, the Supreme Court invalidated the entry and arrest in light of the minor nature of the offense. *Id.* at 747-48, 750 ("Our hesitation in finding exigent circumstances . . . is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor."); *accord United States v. Johnson*, 256 F.3d 895, 908 (9th Cir. 2001) (en banc) (recognizing that where the police are in hot pursuit of defendant who has committed the misdemeanor of resisting arrest, the relatively minor nature of the offense "weighs heavily against" the reasonableness of a warrantless entry onto a suspect's property based on exigent circumstances). Doubtless, a *Terry* stop is less intrusive on personal security than the home entry in *Welsh*; however, that distinction does not detract from the Fourth Amendment command common to both settings that individual privacy must be protected from unreasonable encroachment where the defendant has committed a mere misdemeanor. *See Johnson*, 256 F.3d at

**[6]** Despite the misdemeanor-felony distinction, and the fact that some courts have relied on this distinction to limit *Hensley*, we decline to adopt a *per se* standard that police may not conduct a *Terry* stop to investigate a person in connection with a past completed misdemeanor simply because of the formal classification of the offense. We think it depends on the nature of the misdemeanor. Circumstances may arise where the police have reasonable suspicion to believe that a person is wanted in connection with a past misdemeanor that the police may reasonably consider to be a threat to public safety. *See, e.g., Myers*, 490 So. 2d at 704 (reckless driving), *Devils Lake*, 639 N.W.2d at 467 (altercation with a potential for violent escalation); *Burgess*, 776 A.2d at 1228 (drunken person making threats that he would shoot vehicle if not moved). We leave that case for another day.

**[7]** We adopt the rule that a reviewing court must consider the nature of the misdemeanor offense in question, with particular attention to the potential for ongoing or repeated danger (*e.g.*, drunken and/or reckless driving), and any risk of escalation (*e.g.*, disorderly conduct, assault, domestic violence). An assessment of the "public safety" factor should be considered within the totality of the circumstances, when balancing the privacy interests at stake against the efficacy of a *Terry* stop, along with the possibility that the police may have alternative means to identify the suspect or achieve the investigative purpose of the stop.

## B

**[8]** We conclude that Officers Roeder's and McGuire's investigatory stop of Grigg was not reasonable. As discussed above, the exceedingly harmless past misdemeanor conduct

908 n.6. ("[I]n situations where the underlying offense is only a misdemeanor, law enforcement must yield to the Fourth Amendment in all but the 'rarest' cases." (quoting *Welsh*, 466 U.S. at 753)).

— allegedly playing one's car stereo at a volume in suspected violation of a local noise ordinance — need not spur the police into instant action as might the opportunity to stop a reputedly armed felon, street fighter, or reckless driver. *Cf. Hensley*, 469 U.S. at 223; *Devils Lake*, 639 N.W.2d at 467; *Myers*, 490 So.2d at 704. So far as we can discern, if Officers McGuire and Roeder had not stopped Grigg, the threat to public safety from his loud music would have been nil. Given the lack of exigency to seize Grigg temporarily, his interest in personal security against governmental intrusion is entitled to more deference.

Moreover, the countervailing strength of the governmental interest in crime prevention must be gauged in light of the alternative methods the Nampa police had to ascertain Grigg's identity. The district court made findings with respect to two alternative means of identifying Grigg. First, the district court determined that it would have been unreliable for Officer McGuire to have dispatch check the complaint logs. In addition, the district court found that the length of time required to have dispatch check the logs would have permitted Grigg to leave the area. This finding appears to us to be correct because a check of the complaint logs would have been ineffective where Harmel did not know Grigg's identity and he could thus not have provided it in a previous complaint.

**[9]** The district court's second finding that Officers McGuire and Roeder could not have retrieved reliable information about the driver of the Cougar from the residence at 1800 East Dewey Street, however, is less tenable. The district court found that this method was unreliable because the officers could not have known whether anyone was home at the residence; and if someone were home, whether the resident would have provided the information sought because that person would have been under no duty to do so. Although the possibility of non-cooperation existed, it was too speculative to support the district court's finding, where there was at least a reasonable probability that a resident would have given the

information upon police inquiry. We may not lightly assume that members of the public will necessarily be uncooperative. There was no reason here to assume that police questioning of the neighbors about a noisy car would have met a stone wall. The Nampa police took no steps to pursue these opportunities to investigate the noise complaint, although they might have been equally fruitful as directly pulling over Grigg. That Grigg was leaving the area, on which the district court relied to support its reasoning, has relatively minimal force because of the innocuous nature of the offense and the possibility that the driver could be identified by further investigation. Moreover, the district court's finding of unreliability is not entirely supported by the record because Officer McGuire testified that absent the opportunity to stop Grigg directly, and in lieu of the ineffective method of checking the complaint logs, "it would have been quicker for me to just go down to the address where he came from and ask them for the name of the individual that had just left. I would have probably investigated it that way." There was no testimony that Officers McGuire and Roeder lacked confidence that contact with the residents at 1800 East Dewey Street would have produced Grigg's identity. Finally, the district court's speculation that the residents might not have been home is not a powerful ground for an immediate stop of the car because Grigg had left the residence only moments before the stop, and even if the residents were away temporarily, the police could have returned to question them.

[10] That the police failed to run a routine license check on the Cougar compounds the unreasonableness of the stop. On this point, the district court made no finding, although Officer Roeder was in a position, as he trailed Grigg before pulling him over, to run a check on the license plate that would have accessed solid information on the Cougar and the registered owner.[9] While it is possible that Grigg might have borrowed

---

[9]We have recently held that "when police officers see a license plate in plain view, and then use that plate to access additional non-private information about the car and its owner, they do not conduct a Fourth Amendment search." *United States v. Diaz-Castaneda*, No. 06-30047, 2007 WL 2044244 at *4 (9th Cir. July 18, 2007).

the car from the owner, a police officer's license plate check is a standard procedure for gathering information about a suspected violation of the law that went untested here.

This case is nonetheless difficult because we recognize that the police have a manifest interest in identifying the perpetrators of crime, whether the offense be minor or major. Finding the violator of even a humble noise ordinance has some value to society and certainly would have rewarded the persistent concern of the complaining neighbor Harmel. But giving satisfaction to Mr. Harmel and locating the source of annoyingly loud music are not all that guide us. There is a traditional and constitutionally preserved interest in personal security from governmental intrusion, which fuels the requirements that the police obtain warrants before making an arrest and that police have reasonable suspicion that criminal activity is afoot before making a *Terry* stop. The matter, in our view, stands on different footing with regard to a completed crime that is a misdemeanor that does not endanger the public.

Directly pulling over the driver of the Cougar was indeed the most efficient approach to investigating Harmel's complaint. But simple efficiency and expediency of law enforcement efforts do not automatically override the other crucial element of the *Hensley* balancing test — personal security from governmental intrusion in the operation of one's vehicle. *See Brignoni-Ponce*, 422 U.S. at 878 ("[T]he reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."); *see also Prouse*, 440 U.S. at 657 (noting vehicle stops "interfere with freedom of movement, are inconvenient,[ ]consume time . . . [and] may create substantial anxiety"). Moreover, the reasonableness of an investigative stop is to a degree undermined, where, as here, the police have not pursued alternate available opportunities to gather information about the driver. That Grigg was leaving the area might have warranted an immediate *Terry* stop at the expense of alternative investigative meth-

ods in circumstances involving an offense that threatened public safety, but the noise violation here created no such exigency. To validate the investigative stop under these circumstances would invite the erosion of the Fourth Amendment rights of Grigg and others.

## IV

[11] We hold that under the balancing test set forth in *Hensley*, a court reviewing the reasonableness of a stop to investigate a past misdemeanor (or other minor infraction) must assess the potential risk to public safety associated with the nature of the offense. Under the circumstances here, it was unreasonable for the Nampa police to pull over Grigg on suspicion of having played his music too loudly where they did not duly consider the lack of any threat to public safety, especially given the untested alternative means of ascertaining Grigg's identity. The motion to suppress was erroneously denied.[10] We reverse Grigg's conviction and remand to the district court for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

[10]Because we vacate the conviction and remand on this ground, we do not reach Grigg's claims of prosecutorial misconduct.