**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 25, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID S. MORAN,

Defendant - Appellant.

No. 06-2175

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D. Ct. No. CR-05-1547 WPJ)**

---

Dennis J. Candelaria, Assistant Federal Public Defender, Office of the Federal Public Defender for the District of New Mexico, Las Cruces, New Mexico, appearing for Defendant-Appellant.

Terri J. Abernathy, Assistant United States Attorney (David C. Iglesias, United States Attorney, with her on the brief), Office of the United States Attorney for the District of New Mexico, Las Cruces, New Mexico, appearing for Plaintiff-Appellee.

---

Before **TACHA**, Chief Circuit Judge, **BRISCOE**, and **GORSUCH**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

A jury convicted Defendant-Appellant David Moran of one count of being a felon in possession of a firearm, a violation of 18 U.S.C. § 922(g)(1). He appeals his conviction, arguing that the District Court erred in refusing to grant his motion to suppress evidence, abused its discretion by admitting evidence of a prior conviction under Federal Rule of Evidence 404(b), and erred by failing to instruct the jury on his theory of defense. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

On January 8, 2005, Wanetta Ferguson, a resident of Mayhill, New Mexico, in Otero County, reported a trespasser on her property on Sleeping Bear Lane.[1] Located in the Sacramento Mountains, Mayhill is a rural community that is not densely populated. The Fergusons' property borders a national forest, and the easiest way to access the public lands of the forest from Sleeping Bear Lane is by crossing the Fergusons' property or the neighboring property, which belongs to the Pattersons. Licensed individuals may hunt on these public lands, and this particular time of year was bow hunting season.

Sergeant John Braziel of the Otero County sheriff's office received a

---

[1]Under New Mexico law, criminal trespass "consists of knowingly entering or remaining upon posted private property without possessing written permission from the owner or person in control of the land," N.M. Stat. § 30-14-1(A) (2006), or "knowingly entering or remaining upon the unposted lands of another knowing that such consent to enter or remain is denied or withdrawn by the owner or occupant thereof," *id.* § 30-14-1(B). Criminal trespass is a misdemeanor. *Id.* § 30-14-1(E).

dispatch reporting the trespass complaint at approximately 11:49 a.m. He responded to Mrs. Ferguson's report and spoke to Mrs. Ferguson at her residence. Mrs. Ferguson reported that she saw Mr. Moran on her property earlier that day and that the Fergusons had told him several times that he does not have permission to be there. Sergeant Braziel did not see Mr. Moran on the property, but told Mrs. Ferguson that he would tell Mr. Moran to stay off her property the next time he saw him.

Later that day, at approximately 4:45 p.m., Sergeant Braziel received a second report that Mr. Moran was trespassing on the Fergusons' property and again set out for the property. Officer Ty Jackson of the New Mexico Department of Game and Fish heard the call from Otero County dispatch reporting the trespassing complaint and also responded to the call.[2] Cloudcroft Chief of Police Gene Green responded as well.[3]

Sergeant Braziel and Officer Green arrived at the Fergusons' property at approximately 5:00 p.m. Officer Jackson arrived shortly thereafter. Sergeant Braziel and Officer Jackson observed a black SUV parked across the road at William Barr's residence. Sergeant Braziel knew that Mr. Moran usually drove

_____

[2]The Game and Fish officers often handle trespass complaints related to hunting and have the authority to make arrests for trespassing in conjunction with violations of state game and fish laws.

[3]We refer to Sergeant Braziel, Officer Jackson, and Chief Green collectively as "the officers."

one of two vehicles, a white jeep or a black SUV.

Sergeant Braziel spoke with Mr. and Mrs. Ferguson, who told Sergeant Braziel that Mr. Moran was still on their property or on the hill behind it. Sergeant Braziel looked around the area surrounding the Fergusons' residence, but did not see Mr. Moran. Meanwhile, Officer Jackson interviewed the Fergusons' neighbors, the Pattersons. The Pattersons' property adjoins the Fergusons' and also borders the national forest. Mr. Patterson told Officer Jackson that they had given Mr. Moran permission to cross their property to go hunting in the national forest after he threatened to kill all the deer behind their property if they refused. After speaking with the Pattersons, Officer Jackson returned to the Fergusons' property, where Sergeant Braziel and Chief Green were waiting. Officer Jackson spoke with Mr. Ferguson, who reported having had several confrontations with Mr. Moran about trespassing on his land and indicated he did not want Mr. Moran on his property.

While the officers were talking to the Fergusons, the black SUV pulled out of Mr. Barr's driveway. Sergeant Braziel, Officer Jackson, and Chief Green, all in separate patrol vehicles, followed the vehicle, and Sergeant Braziel stopped the SUV approximately one-quarter of a mile from the Barr residence. It was dark when Sergeant Braziel stopped the vehicle. Sergeant Braziel exited his car and approached the SUV, shining his flashlight through the windows to see if there were any passengers inside the car. When he did so, he saw the butt of a rifle

-4-

stock sticking out of an unzipped rifle case on the back seat. On the seat next to the rifle were a bow and arrows. Sergeant Braziel asked Mr. Moran, the sole occupant of the vehicle, to exit the SUV, and Mr. Moran complied. Sergeant Braziel then asked Mr. Moran who owned the rifle, and Mr. Moran responded that it belonged to his girlfriend, Melinda Cheek. Ms. Cheek also apparently owned the SUV. Mr. Moran explained to the officers that he had been bow hunting.

As Sergeant Braziel and Chief Green conducted a records check on Mr. Moran, Officer Jackson asked for and received permission to look inside the SUV. Officer Jackson opened the rear passenger door, removed the rifle case, and asked Mr. Moran if the rifle was loaded. Mr. Moran responded that it was. Officer Jackson asked Mr. Moran why he had the rifle, and Mr. Moran responded that he always had a rifle in his vehicle. The incident ended when Officer Jackson arrested Mr. Moran on an unrelated warrant.

A grand jury returned an indictment against Mr. Moran for being a felon in possession of a firearm on July 21, 2005. On November 1, 2005, Mr. Moran filed a motion to suppress physical evidence and statements, which the District Court denied. On January 26, 2006, Mr. Moran filed a motion in limine to exclude evidence of his prior convictions, and on February 3, the United States filed a notice of intent to offer evidence of other crimes or bad acts pursuant to Federal Rule of Evidence 404(b). The court granted Mr. Moran's motion in part, excluding all evidence of prior convictions except for a March 1994 conviction

-5-

for being a felon in possession of a firearm. Mr. Moran's case went to trial on February 14, and at the end of the trial, the District Court declined to give Mr. Moran's requested jury instructions relating to knowledge and possession. A jury found Mr. Moran guilty on February 16, 2006, and he timely filed a notice of appeal.

## II. DISCUSSION

A. Reasonable Suspicion to Stop Mr. Moran

When reviewing the denial of a motion to suppress, "we accept the district court's factual findings and determinations of witness credibility unless they are clearly erroneous." *United States v. Harris*, 313 F.3d 1228, 1233 (10th Cir. 2002) (quotation omitted). "We are permitted to consider evidence introduced at the suppression hearing, as well as any evidence properly presented at trial," *id.*, and we view the evidence in the light most favorable to the government, *United States v. Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004). We review de novo the ultimate question of reasonableness under the Fourth Amendment. *Id.*

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "[S]topping a car and detaining its occupants [for investigatory purposes] constitute[s] a seizure within the meaning of the Fourth Amendment." *United States v. Hensley*, 469 U.S. 221, 226 (1985). We measure the constitutional validity of an investigatory stop by the standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), asking whether the stop is "supported

by a reasonable suspicion of criminal activity." *United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002). In so doing, "we examine the events that occurred leading up to the stop to determine whether the 'historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion.'" *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). We have explained that "an officer with reasonable suspicion need not 'rule out the possibility of innocent conduct' as long as the totality of the circumstances suffices to form 'a particularized and objective basis'" for a stop. *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 277–78 (2002)).

Mr. Moran argues that the District Court should have suppressed physical evidence obtained after officers unlawfully stopped the SUV he was driving. Specifically, Mr. Moran argues that the stop was unreasonable because the officers did not have a reasonable suspicion that he was driving the SUV when they pulled him over. In addition, Mr. Moran contends that police may stop an individual based on suspicion of past criminal activity only when the crime at issue is a felony offense; because the officers were investigating a completed misdemeanor, he argues the stop violated the Fourth Amendment. As we explain below, we reject both arguments.

1. *Reasonable Suspicion that Mr. Moran was Driving the SUV*

We first address Mr. Moran's argument that the officers did not have

reasonable suspicion that he was driving the SUV. Mr. Moran does not dispute that the officers had a reasonable suspicion that he criminally trespassed on the Fergusons' property. Instead, he argues that the officers lacked particularized suspicion that he was driving the black SUV. To the contrary, the totality of circumstances here is sufficient to lead an objectively reasonable officer to believe that Mr. Moran was driving the black SUV when the officers stopped the vehicle.

The evidence shows that Mrs. Ferguson had encountered Mr. Moran in the past on her property. As a result, Mrs. Ferguson could reliably identify him as the alleged trespasser when she reported the two incidents of trespass to the Otero County sheriff's office. *See Adams v. Williams*, 407 U.S. 143, 146–47 (1972) (concluding officer had reasonable suspicion to stop defendant based on information from a citizen informant); *United States v. Tucker*, 305 F.3d 1193, 1201 (10th Cir. 2002) (noting that citizen informants known to police are presumed to be reliable). When Sergeant Braziel arrived at the Fergusons' property at approximately 5:00 p.m., the Fergusons reported that Mr. Moran was still on their property or in the area behind it. Sergeant Braziel observed a black SUV across the road from the Fergusons' property and had personal knowledge that one of the cars Mr. Moran drove was a black SUV. Thus, the totality of the circumstances—the Fergusons' reliable report that Mr. Moran was in the vicinity of the alleged crime, the fact that Sergeant Braziel saw a black SUV in the

-8-

immediate vicinity of the alleged crime, and his knowledge that Mr. Moran drove a black SUV—is sufficient to establish a reasonable suspicion that Mr. Moran was driving the black SUV.

2.    *Legality of Stop Based on Suspicion of a Completed Misdemeanor*

Mr. Moran also argues that the stop violated the Fourth Amendment because the officers stopped the vehicle to investigate a completed misdemeanor. In *United States v. Hensley*, the Supreme Court held that the Fourth Amendment permits police officers to conduct an investigatory stop if they have a "reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony." 469 U.S. at 229. The Court made clear, however, that "[w]e need not and do not decide today whether *Terry* stops to investigate all past crimes, however serious, are permitted." *Id.* Despite the Court's explicit reservation, Mr. Moran argues that *Hensley* prohibits all investigatory stops based on reasonable suspicion of a completed misdemeanor. We note that this is a matter of first impression in our Circuit and that the Sixth and Ninth Circuits have split on the issue. *Compare Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004) ("Police may . . . make a stop when they have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor."), *with United States v. Grigg*, — F.3d —, 2007 WL 2379615, at *9 (9th Cir. 2007) (holding that, in reviewing the reasonableness of a stop to investigate a completed

misdemeanor, a court "must consider the nature of the misdemeanor offense in question, with particular attention to the potential for ongoing or repeated danger . . . and any risk of escalation"). Mindful of "the fact-specific nature of the [Fourth Amendment] reasonableness inquiry," *Ohio v. Robinette*, 519 U.S. 33, 39 (1996), we hold that the officers' investigatory stop of Mr. Moran was reasonable in light of the particular facts and circumstances of this case.

Following the Supreme Court's approach in *Hensley*, we determine the constitutionality of an investigatory stop by balancing "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Hensley*, 469 U.S. at 228.[4] We first evaluate the governmental interests involved in the officers' stop of Mr. Moran. In *Hensley*, the Court explained that the governmental interest in crime prevention

---

[4]Mr. Moran cites *United States v. Halliburton*, 966 F.2d 1454, 1992 WL 138433 (6th Cir. 1992), an unpublished Sixth Circuit case, to convince this Court to adopt the rule that seizure based on suspicion of a completed misdemeanor is per se unreasonable. We are not persuaded, however, by the Sixth Circuit's reasoning. In *Halliburton*, the court concluded—based solely on *Hensley*'s holding that a stop involving investigation of a completed *felony* may be reasonable—that an officer's seizure of an individual based on suspicion of *misdemeanor* indecent exposure was unreasonable. 1992 WL 138433, at *4. The Sixth Circuit did not balance the nature of the seizure against the governmental interests implicated under the circumstances to reach this conclusion. Indeed, the Sixth Circuit has indicated that police may *never* base reasonable suspicion on a completed misdemeanor. *See Gaddis*, 364 F.3d at 771 n.6. This approach is contrary to the reasoning in *Hensley*. *See Grigg*, 2007 WL 2379615, at *5 (concluding "the Supreme Court's methodology in *Hensley* applies" to the reasonableness analysis of a stop based on a completed misdemeanor). As we explain above, to determine whether a stop based on past criminal activity is reasonable, we engage in a fact-specific balancing test.

and detection, necessarily implicated in a stop to investigate ongoing or imminent criminal conduct, may not be present when officers are investigating past criminal conduct. *Id.* at 228. A stop to investigate past criminal activity may, however, serve the governmental interest in "solving crimes and bringing offenders to justice." *Id.* at 229. This interest is particularly strong when the criminal activity involves a threat to public safety. *Id.* (noting the interest is particularly strong "in the context of felonies or crimes involving a threat to public safety"); *see also Grigg*, 2007 WL 2379615, at *8 (holding a "court reviewing the reasonableness of an investigative stop must consider the nature of the offense, with particular attention to any inherent threat to public safety associated with the suspected past violation").

The circumstances of the present case implicate a strong governmental interest in solving crime and bringing offenders to justice because the alleged underlying criminal activity posed an ongoing risk to public safety. First, a criminal trespass inherently involves some risk of confrontation with the property owner. Importantly, in this case, the risk of confrontation was not hypothetical. Mr. Ferguson reported that he had previously encountered Mr. Moran on his property and had confronted him about trespassing. *See Grigg*, 2007 WL 2379615, at *9 (noting police may consider "past altercation with a potential for violent escalation" as a threat to public safety). The record also shows that the officers received reliable information that Mr. Moran had threatened the

-11-

Pattersons to gain access across their land to the national forest. Furthermore, because Mr. Moran was allegedly crossing the Fergusons' property to hunt, a reasonable officer could assume that he was likely carrying a weapon. Finally, the officers had reason to believe that criminal activity would recur: the officers received two complaints on the same day that Mr. Moran was trespassing across private property for the purpose of hunting, and the Fergusons' reports indicated that the trespassing was a recurring problem. *See id.* at \*8 (noting law enforcement interest is stronger when intervention of "investigating officer might eliminate any ongoing risk that an offending party might repeat the completed misdemeanor or . . . might stem the potential for escalating violence arising from such conduct"). In sum, the alleged history of confrontation and threats, combined with the specific nature of the trespass (i.e., for the purpose of hunting) and the likelihood that the alleged criminal activity would recur, created a situation "involving a threat to public safety," *Hensley*, 469 U.S. at 229. Under these circumstances, "it is in the public interest that the crime be solved and the suspect detained as promptly as possible." *Id.*

We acknowledge that the governmental interest in solving crime may be weaker when police have alternative methods of investigating the crime. *See id.* (explaining that, "where police have been *unable to locate* a person suspected of involvement in a past crime," an investigatory stop promotes the strong governmental interest in solving crimes (emphasis added)). Here, the officers

-12-

knew Mr. Moran and could have attempted to locate him at his home or elsewhere. But because Mr. Moran had allegedly committed the criminal trespass just minutes before the officers stopped him, the governmental interest in solving the crime was strong. To restrain police action in such a situation would be to require police to turn their backs on potential criminal activity and to "enable the suspect to flee," *id.* at 229. Indeed, at the time he was stopped, Mr. Moran more nearly represented an individual in the process of violating the law or a suspect fleeing from the scene of a crime than "a suspect in a past crime who now appears to be going about his lawful business," *id.* at 228. Under these circumstances, when past criminal activity suggests an ongoing threat to public safety, a stop may further a strong governmental interest in solving crime.

Recognizing this governmental interest, we next consider whether, balanced against the nature of the intrusion, the stop was reasonable. An investigatory stop is by definition "brief" and "non-intrusive." *United States v. Johnson*, 364 F.3d 1185, 1188 (10th Cir. 2004); *see also Delaware v. Prouse*, 440 U.S. 648, 653 (1979) (noting investigatory stop of automobile "is limited [in purpose] and the resulting detention quite brief"); *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993) (explaining *Terry* stop is "usually characterized as a brief, nonintrusive detention during a frisk for weapons or preliminary questioning"). Balanced against the strong governmental interest in solving crime, the relatively limited intrusion on personal security occasioned by an investigatory stop was warranted

-13-

and the officers' seizure of Mr. Moran was not unreasonable.

To be clear, we stress the limited and fact-dependent nature of our holding. We do not suggest that all investigatory stops based on completed misdemeanors are reasonable or even that any stop based on a completed criminal trespass is per se reasonable. Several facts are essential to our holding: the officers had reasonable suspicion that Mr. Moran repeatedly committed the very same crime in question (criminal trespass on the Fergusons' property); the officers received a report of the same crime earlier on the day of the stop; a reasonable officer could conclude that Mr. Moran was likely to repeat the crime in the future; the specific nature of the trespass and Mr. Moran's reported history with the Fergusons and Pattersons indicated a threat to public safety; and the officers encountered Mr. Moran just minutes after the crime allegedly occurred. These facts implicate the governmental interest discussed above, which when balanced against the brief and nonintrusive nature of an investigatory traffic stop, render the officers' actions in seizing Mr. Moran reasonable.

B.    Admission of 404(b) Evidence

Mr. Moran argues that the District Court abused its discretion by admitting evidence of his March 1994 conviction for being a felon in possession of a firearm under Federal Rule of Evidence 404(b). We review a district court's evidentiary rulings under Rule 404(b) for abuse of discretion. *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006). "We will not reverse a district

court's ruling if it falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical." *Id.* (quotations and alteration omitted).

Under Rule 404(b), evidence of other acts may be admissible for purposes other than proof of a defendant's bad character or general propensity to commit crime. The rule provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Evidence is admissible under Rule 404(b) if the four factors identified in *Huddleston v. United States* are satisfied: (1) the evidence must be offered for a proper purpose; (2) it must be relevant; (3) its probative value must not be substantially outweighed by its potential for unfair prejudice under Rule 403; and (4) the court must give a proper limiting instruction, if it is requested by the defendant. 485 U.S. 681, 691–92 (1988).

In the case before us, evidence of the conviction was offered for proper purposes under Rule 404(b). The Government introduced evidence of Mr. Moran's prior conviction to prove the only challenged element of the felon-in-possession offense: that Mr. Moran "knowingly possessed" the firearm. *See United States v. Ledford*, 443 F.3d 702, 705 (10th Cir. 2005) (setting forth

-15-

elements of crime of felon in possession).[5]  Mr. Moran claimed that he did not

know the rifle, which belonged to his girlfriend, was in the SUV, his girlfriend's

car.  Thus, the Government presented, and the district court admitted, evidence of

the prior conviction to show "knowledge, intent, and absence of mistake or

accident," proper purposes under Rule 404(b).[6]

In addition, the conviction is relevant under *Huddleston*'s second factor

because it is probative to demonstrate that Mr. Moran "knowingly" possessed the

firearm.  *See United States v. Mills*, 29 F.3d 545, 549 (10th Cir. 1994) (affirming

district court's admission of prior gun possession to show knowledge).  Mr.

Moran denied knowledge of the rifle in the car, and the government had the

burden of proving knowing possession of the firearm.  To prove the knowledge

element of the offense, the government offered evidence that Mr. Moran

knowingly possessed a firearm at another point in time.  Because the prior

conviction required the same knowledge, evidence of the conviction had a

---

[5]To obtain a conviction for felon in possession, the government must prove: "(1) the defendant was previously convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm; and (3) the possession was in or affecting interstate commerce." *Ledford*, 443 F.3d at 705.  The parties stipulated to the first and third elements.

[6]The District Court concluded that the conviction was admissible to show knowledge, intent, and absence of mistake or accident.  We note that the crime of felon in possession under 18 U.S.C. § 922(g)(1) is a general intent crime.  *See Ledford*, 443 F.3d at 716.  The government need not prove any particular "intent," but must show only that a felon possessed a firearm "knowingly."  *Id.*  Thus, "knowledge" and "intent" are equivalent here.

"tendency to make the existence of" Mr. Moran's knowledge of the rifle in the present case "more probable . . . than it would be without the evidence." Fed. R. Evid. 401; *see also Mares*, 441 F.3d at 1157 (noting that, when admitted to show knowledge, prior acts must be similar to the charged offense). In other words, the fact that Mr. Moran *knowingly* possessed a firearm in the past supports the inference that he had the same knowledge in the context of the charged offense. *See United States v. Walker*, 470 F.3d 1271, 1274 (8th Cir. 2006) ("Evidence that a defendant possessed a firearm on a previous occasion is relevant to show knowledge and intent."); *United States v. Jernigan*, 341 F.3d 1273, 1281 (11th Cir. 2003) ("[T]he caselaw in this and other circuits establishes clearly the logical connection between a convicted felon's knowing possession of a firearm at one time and his knowledge that a firearm is present at a subsequent time (or, put differently, that his possession at the subsequent time is not mistaken or accidental)."); *United States v. Cassell*, 292 F.3d 788, 795 (D.C. Cir. 2002) ("A prior history of intentionally possessing guns, or for that matter chattels of any sort, is certainly relevant to the determination of whether a person in proximity to such a chattel on the occasion under litigation knew what he was possessing and intended to do so.").

We acknowledge that the use of Mr. Moran's prior conviction to prove knowledge involves a kind of propensity inference (i.e., because he knowingly possessed a firearm in the past, he knowingly possessed the firearm in the present

-17-

case). But the inference is specific and does not require a jury to first draw the forbidden general inference of bad character or criminal disposition; rather, it rests on a logic of improbability that recognizes that a prior act involving the same knowledge decreases the likelihood that the defendant lacked the requisite knowledge in committing the charged offense. *See United States v. Queen*, 132 F.3d 991, 996 (4th Cir. 1997) (explaining that similar prior act decreases the likelihood that the charged offense was committed with innocent intent). Moreover, when other-act evidence is admitted for a proper purpose and is relevant, it may be admissible even though it has "the potential impermissible side effect of allowing the jury to infer criminal propensity." *United States v. Cherry*, 433 F.3d 698, 701 n. 3 (10th Cir. 2005) (quotation omitted). That is, such evidence may be admissible under Rule 404(b) as long as it tends to prove something other than criminal propensity. *See United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) ("Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." (quotation omitted)); *United States v. Esch*, 832 F.2d 531, 535 (10th Cir. 1987) ("Evidence of other acts is not admissible *solely* to prove a defendant's criminal disposition." (emphasis added)).

Although the evidence's potential to lead the jury to an impermissible inference does not automatically prevent its admission, this potential prejudicial effect is part of a court's balancing determination under the third *Huddleston*

factor. Evidence that is otherwise admissible under Rule 404 may nonetheless be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. "Unfair prejudice in the Rule 403 context 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Tan*, 254 F.3d at 1211 (quoting Fed. R. Evid. 403 advisory committee's note). Here, the District Court explicitly considered the probative value of the evidence and its potential prejudicial effect and determined that "the potential prejudice to the defendant does not outweigh the highly probative nature of such evidence." As we explain below, none of Mr. Moran's arguments convince us that the court abused its discretion. *Cherry*, 433 F.3d at 702 (noting we give district courts broad discretion in making Rule 403 balancing decisions).

Mr. Moran argues that the court abused its discretion because the prior conviction was not similar in nature or close enough in time to the charged offense. But as we explain above, the prior act was sufficiently similar to have probative value in proving knowledge. In addition, the passage of time does not diminish the prior act's probative worth in this case. The determination of whether a period of time diminishes a prior act's probative value "will necessarily depend on the unique facts of each case's proffered evidence." *Mares*, 441 F.3d at 1159. Here, because Mr. Moran denied he had knowledge of the rifle, the prior

conviction had clear probative value in rebutting this defense. Morever, based on Mr. Moran's arguments, we have no reason to conclude that the evidence was unduly prejudicial because it "had substantial potential to cause the jury to decide the case on an emotional basis." *United States v. Higgins*, 282 F.3d 1261, 1274 (10th Cir. 2002). Hence, in balancing the evidence's probative value against the danger of unfair prejudice, the district court did not abuse its discretion. *See United States v. Bonnett*, 877 F.2d 1450, 1461 (10th Cir. 1989) ("The closeness in time and the similarity in conduct were matters left to the trial court, and [its] decision will not be reversed absent a showing of abuse of discretion.").

Finally, the court satisfied the fourth *Huddleston* factor by giving a limiting instruction, which cautioned the jury to consider the evidence "only as it bears on the defendant's intent, knowledge, absence of mistake or accident, and for no other purpose." *See* 10th Cir., Criminal Pattern Jury Instructions (2005 ed.), No. 1.30. Because all four *Huddleston* factors are satisfied, the district court did not abuse its discretion by admitting evidence of Mr. Moran's prior conviction under Rule 404(b).

C.    Jury Instructions

Mr. Moran argues that the District Court erred by refusing to give his requested jury instructions on knowledge and fleeting possession. We review the District Court's refusal to give requested instructions for abuse of discretion. *United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006). To assess

whether the court properly exercised its discretion, "we review the jury instructions de novo to determine whether, as a whole, they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *Id.*

To convict a defendant for being a felon in possession of a firearm, the jury must find that the defendant knowingly possessed a firearm. *See* 18 U.S.C. § 924(a)(2). The jury instructions explained: "The word 'knowingly,' as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident." Mr. Moran requested the following instruction, which he contends the court erroneously refused to provide:

> It is the government's burden to prove, beyond a reasonable doubt, that Mr. Moran "knowingly" possessed the firearm. Mr. Moran has told you that although the firearm was found in the truck he was driving, he did not know it was there. If you determine that the government has not proved beyond a reasonable doubt that Mr. Moran knew the gun was in the truck, then you must find Mr. Moran not guilty.

Mr. Moran argues that this instruction was required because it states his theory of the case. But although Mr. Moran may be entitled to jury instructions on the law underlying his theory of the case, he is not entitled to instructions stating the specific facts of this theory. *Crockett*, 435 F.3d at 1314 ("A defendant is entitled to an instruction on his theory of the case if the instruction is a correct statement of the *law*, and if he has offered sufficient evidence for the jury to find

in his favor." (emphasis added)). Indeed, such an instruction could lead "the jury to believe that the district court was putting its imprimatur on [the] [d]efendant's factual theory of the case." *United States v. Grissom*, 44 F.3d 1507, 1513 (10th Cir. 1995). Here, the given knowledge instruction correctly explained "knowing" possession, and the instructions elsewhere provided that the government must prove the defendant's guilt beyond a reasonable doubt. We therefore conclude that the District Court adequately informed the jury of the relevant law and did not err in refusing to give Mr. Moran's fact-specific instruction.

Mr. Moran also contends that the District Court erred by failing to instruct the jury on the theory of fleeting possession. A "court need only give a fleeting possession instruction when the evidence at trial supports a possible finding that the defendant only momentarily possessed the [firearm], and in so doing, lacked either knowledge he possessed [the firearm] or criminal intent to possess it." *United States v. Adkins*, 196 F.3d 1112, 1115 (10th Cir. 1999). The court clearly did not err in the present case because Mr. Moran presented no evidence indicating that he possessed the firearm only "momentarily."

Despite this deficiency, he argues that the instruction was necessary because the evidence allowed the jury to infer that he possessed the gun ignorantly or accidentally and therefore lacked criminal intent to possess it. This argument is without merit because the District Court's knowledge instruction adequately addressed this theory. *See United States v. Alonso*, 790 F.2d 1489,

1496 (10th Cir. 1986) ("It is not error to refuse to give a requested instruction if the same subject matter is adequately covered in the general instructions." (quotation and alteration omitted)). The court instructed the jury that an act is done "knowingly" if "the act was done voluntarily and intentionally, *not because of mistake or accident*." (emphasis added). As a whole, therefore, the jury instructions adequately informed the jury of the governing law and Mr. Moran's theory of defense. *Cf. Alonso*, 790 F.2d at 1496–97 (holding district court did not err in refusing to give "mere presence" instruction in aiding-and-abetting narcotics violation because instructions stated that government was required to prove willful association and willful participation).

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the District Court's rulings and Mr. Moran's conviction.