MATHESON, Circuit Judge.
Appellant-Defendant Louis Roberson pled guilty to being a felon in possession in violation of 18 U.S.C. § 922(g)(1). His plea was conditioned on his ability to pursue this appeal of the district court’s denial of his motion to suppress evidence of his firearm under the Fourth Amendment.
Mr. Roberson argued in district court and now on appeal that he submitted to police officers’ show of authority when they shined bright lights on him and approached his car in a parking lot. He contends that because he had immediately submitted and was therefore seized at this point without reasonable suspicion, the ensuing search of his car violated the Fourth Amendment.
I would affirm the district court because, assuming the bright lights and officers’ approach amounted to a show of authority, Mr. Roberson did not submit until later when the officers had reasonable suspicion to seize him. Judge Hartz would affirm because the police did not exercise a show of authority when they shined the lights and approached the car. Judge Moritz would reverse because the officers’ actions amounted to a show of authority and Mr. Roberson submitted before the officers had reasonable suspicion to detain him.
Based on the foregoing, and exercising jurisdiction under 28 U.S.C. § 1291, the court affirms.
I. BACKGROUND
The following facts are taken from evidence presented at the suppression hearing. They are presented in the light most favorable to the Government because the district court denied Mr. Roberson’s motion to suppress. United States v. Moran, 503 F.3d 1135, 1139 (10th Cir. 2007).
A. Factual Background
Around. 10:15 p.m. on December 31, 2014, Mr. Roberson met a blind date, Annette Byers, at Slick Willie’s Pool Hall in Oklahoma City. They met in Mr. Roberson’s car, which he had backed into a parking spot near the entrance of Slick Willie’s. Mr. Roberson and Ms. Byers talked for about fifteen minutes and smoked a marijuana cigarette—Ms. Byers’s first. Due to the winter chill, Mr. Roberson left the car running.
At 10:30 p.m., four marked Oklahoma City patrol cars drove into the parking lot in “wolf-pack” technique by entering from different corners of the lot. The officers were not responding to a specific incident. They came instead because Slick Willie’s had asked for more frequent police patrol due to problems with criminal activity. Among the police were Sergeants Monte Stephens and Michael Anderson, who entered through the southwest entrance of the parking lot.
Upon entering, Sergeants Stephens and Anderson stopped their patrol car about 15 feet from the first occupied car they saw— Mr. Roberson’s car. The officers tried to make what they called.“voluntary contact” with Mr. Roberson and Ms. Byers. Because the parking lot was dimly lit, they shined spotlights and bright takedown lights on the car.[1] Sergeants Stephens and Anderson then exited their patrol car and “resolutely” walked toward Mr. Roberson’s car from the front. ROA, Vol. I at 54.[2] The officers’ patrol car did not block Mr. Roberson’s car, but their line of approach *1120 meant that Mr. Roberson would have hit the officers had he tried to drive away.[3]
“As soon as” the officers got out of their car or “pretty simultaneously," the officers saw Mr. Roberson making “stuffing motions” underneath the driver’s seat, ROA, Vol. III at 17, 40. After seeing the stuffing motions, the officers ordered Mr. Roberson and Ms. Byers to show their hands, Ms. Byers complied, but Mr. Roberson did not, and instead continued to make the stuffing motions.
The officers then drew their guns and once again commanded Mr. Roberson to show his hands. Mr, Roberson still did not comply. Only when Sergeant Stephens reached the driver’s side window—and after about three or four commands to show his hands—did Mr. Roberson stop the stuffing motions, roll down the window, and put his hands on the steering wheel.[4] The officers opened the door and smelled marijuana. They later found a gun under the driver’s seat, where Mr. Roberson had been making his stuffing motions, and a bag of marijuana in the center console.
In the district court’s words, “ftjhis all unfolded in a big hurry.” ROA, Vol, III at 104. According to Sergeant Stephens, the time between the officers’ exiting their car and reaching the car’s window was “a matter of seconds. Probably ten, 15 seconds. Maybe a little bit more, maybe 30 seconds tops.” Id. at 50,[5]
B. Procedural Background
On August 4, 2015, a federal grand jury indicted Mr. Roberson in the United States District Court for the Western District of Oklahoma for possessing a firearm as a felon,' in violation of 18 U.S.C. § 922(g)(1). Mr, Roberson moved to suppress evidence of his firearm, arguing his seizure and arrest violated the Fourth Amendment, thereby invalidating the search for and recovery of the firearm, On *1121 September 24, 2015, the district court held an evidentiary hearing on the suppression motion. Sergeant Stephens and Ms. Byers were the only witnesses.
On December 3, 2015, the court issued a written order denying the motion to suppress. The court held the officers did not “seize” Mr. Roberson within the 'meaning of the Fourth Amendment until after they had developed reasonable suspicion based on Mr. Roberson’s furtive stuffing motions. The arrest and search were therefore valid.
After the court’s order, Mr. Roberson pled guilty conditioned on his ability to appeal the denial of the suppression motion. On May 16, 2016; the court sentenced Mr. Roberson to 80 months in prison and three years of supervised release.
II. DISCUSSION
On appeal, Mr. Roberson challenges the district court’s order holding the officers did not violate his Fourth Amendment rights. This court should affirm the district court’s denial of Mr. Roberson’s motion to suppress because Mr. Roberson did not submit to the officers’ initial show of authority and therefore was not seized at that time. When the officers later seized Mr. Roberson, they had reasonable suspicion to do so.
A. Standard of Review
. “When reviewing the denial of a motion to suppress, we accept the district court’s factual findings and determinations of witness credibility unless they are clearly erroneous.” Moran, 503 F.3d at 1139 (quotations omitted). But “the ultimate issue of whether a seizure occurred is a question of law, which we review de novo.” United States v. Guerrero, 472 F.3d 784, 786 (10th Cir. 2007). We also review de novo the question of when a seizure occurred. United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010).
B. Legal Standards
1. The Fourth Amendment and Seizure
The Fourth Amendment guarantees “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. Const. amend. IV. A seizure must be “justified at its inception” to comply with the Fourth Amendment. United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014) (quoting Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Mr. Roberson argues he was seized before the officers had reasonable suspicion to do so in violation of the Fourth Amendment,
Fourth Amendment, law recognizes three types of police-citizen encounters: (1) consensual encounters; (2) investigative detentions; and (3) arrests. Both detentions and arrests are seizures. Police must have reasonable suspicion of criminal activity for a detention and probable cause that a crime has been committed for an arrest. See United States v. Hernandez, 846 F.3d 1247, 1271-72 (10th Cir. 2017).
A police officer may seize someone either by physical force or a show of authority. Salazar, 609 F.3d at 1064 (quoting Terry, 392 U.S. at 19 n.16, 88 S.Ct. 1868). As in this case, “[w]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the .citizen ‘submits to the assertion of authority.’” Id. (brackets omitted) (quoting California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). Because the ensuing analysis relies on whether Mr. Roberson submitted to an assertion of authority,. additional legal background on that element follows.
2. Submission to Authority
A show of authority alone is not a seizure “without actual submission.” Brend *1122 lin v. California, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). Actual submission depends on “the view of a reasonable law enforcement officer” under “the totality of the circumstances.” Salazar, 609 F.3d at 1064-65 (quotations omitted). Submission “requires, at minimum, that a suspect manifest compliance with police orders.” Mosley, 743 F.3d at 1326 (quotations omitted).
In Brendlin, the Supreme Court considered whether a car’s passenger, and not just the driver, was seized during a traffic stop. 551 U.S. at 251, 127 S.Ct. 2400. The Court determined the passenger submitted to the officers’ show of authority (flashing lights directing the car to pull over) by staying inside the car. Id. at 260, 262, 127 S.Ct. 2400. The Court reasoned that the passenger “had no effective way to signal submission while the ear was still moving on the roadway, but once it came to a stop he could, and apparently did, submit by staying inside.” Id. at 262, 127 S.Ct. 2400.
Interpreting and applying Brendlin, among other Supreme Court and Tenth Circuit cases, we considered in Mosley whether, from a reasonable officer’s perspective, an individual’s momentary hesitation before making furtive motions constituted submission to a show of authority. 743 F.3d at 1324, 1327. We held that it did not. Id. at 1327. The police in Mosley received an anonymous tip that two people were handling a gun in a car in a Denny’s parking lot. Id. at 1321. Two officers responded and approached the car from the side with weapons drawn. Id. Catching the car’s occupants off guard, the officers— with weapons raised—shouted for the occupants to put their hands up. Id. The driver complied, but the passenger—the defendant—did not. Id. The defendant “hesitated briefly” and then “quickly began making furtive motions [that] ... were consistent with trying to either hide or retrieve a weapon.” Id. The defendant ignored repeated commands to put his hands up but eventually complied. Id. When the defendant disobeyed commands to exit the car, an officer pulled him out, handcuffed him, and took him into custody. Id. at 1321-22.
The district court denied the defendant’s motion to suppress, and we affirmed. Id. at 1321. Although the officers’ actions amounted to a show of authority, we held the defendant was not seized until he complied with their commands to put his hands up. Id. at 1327. The defendant did not “immediately manifest compliance with [the officers’] orders” when he “froze[] momentarily” before making his stuffing motions. Id. We acknowledged “a reasonable officer shouting ‘hands up’ likely would have viewed [the defendant] as ‘seized’ had [he] simply sat still in the car without making furtive motions.” Id.[6] But the defendant’s furtive motions, consistent with hiding or retrieving a gun, did not manifest submission, and instead were “directly contrary to the officers’ commands.” Id. Under the totality of the circumstances, a reasonable law enforcement officer would not view the defendant as submitting until he complied with the officers’ orders to put his hands up. Id.[7]
*1123 Mosley relied in part on our decision in Salazar, which addressed whether a brief hesitation amounted to submission. Id. at 1326 (discussing Salazar, 609 F.3d at 1067). In Salazar, a police officer saw a pickup truck entering a parking lot and drove his patrol car toward the pickup. 609 F.3d at 1061-62. The pickup driver turned on the truck’s headlights and drove toward the patrol car. Id. at 1062. The officer turned on his emergency lights. Id. The pickup driver continued to drive toward the patrol car, stopped, shifted to reverse, and then backed up for 20 seconds. Id. The pickup truck “momentarily stopped” and then drove forward around the driver’s side of the patrol car. Id. When the truck moved past the patrol car, the officer got out of the car, drew his firearm, and ordered the defendant to stop and get out. Id. The defendant complied. Id.
On appeal, relying on our precedent and Supreme Court cases, including Brendlin, we held there was no submission to the officer’s show of authority until the defendant complied with the officer’s command to exit his truck. Id. at 1064,1067. We said a reasonable officer would not have viewed the defendant’s “momentary[] stop” (or “fleeting pause”) after his 20 seconds of backing up as a submission to authority. Id. at 1068.[8]
Mosley also relied on United States v. Johnson, 212 F.3d 1313 (D.C. Cir. 2000), which we stated was “virtually indistinguishable.” Mosley, 743 F.3d at 1327. In Johnson, officers patrolling in a “high narcotics area” saw two people in a parked car in a parking lot. 212 F.3d at 1314. One officer saw the defendant make a “ ‘shoving down’ motion, leading him to believe that [the defendant] might be armed.” Id. at 1316. The officer drew his gun and shouted, “Let me see your hands.” Id. The defendant “did not immediately comply but rather made ‘a couple of more shoving motions down’ before raising his hands.” Id. The officer then searched the defendant and found cocaine on him. Id.
The D.C. Circuit held that a seizure did not take place “immediately after [the defendant’s] first ‘shoving down’ motion,” as the defendant had not yet submitted to the officer’s show of authority. Id. at 1316. “On the contrary, [the defendant] continued to make ‘shoving down’ motions, gestures that were the very opposite of complying with [the officer’s] order, and which a reasonable officer could have thought were actually suggestive of hiding (or retrieving) *1124 a gun.” Id. at 1316-17. The court held that those “continued furtive gestures in response to being confronted by a police officer” created reasonable suspicion to stop the defendant. Id. at 1317. Because reasonable suspicion supported the stop, the following frisk and discovery of the cocaine was proper. Id.
C. Analysis
Mr. Roberson ultimately was seized. Sergeants Stephens and Anderson first detained him based on reasonable suspicion and then arrested him based on probable cause. They next searched his car and found the firearm under the driver’s seat.
The critical question for resolution of this appeal is when Mr. Roberson was seized.[9] The timing of the seizure matters because the firearm evidence must be suppressed if he were seized before the officers developed reasonable suspicion. Mosley, 743 F.3d at 1326. As noted above, the seizure question here turns on a show of authority/submission to authority analysis.
To resolve this appeal, I assume the officers’ initial conduct—shining bright lights on Mr. Roberson’s car and walking toward the ear—was a show of authority, which escalated when the officers commanded Mr. Roberson to put his hands on the steering wheel. The question is whether, based on the nature of the show of authority, Mr. Roberson submitted to that initial show of authority.[10] He did not. Instead, he submitted and was seized only later when he put his hands on the steering wheel in compliance with the officers’ commands. This was the first moment a reasonable officer would think Mr. Roberson had submitted. The officers already had reasonable suspicion before this happened.
I. Analytical Considerations
The following discussion focuses on (1) three key parts of what happened, (2) three aspects of Mosley, and (3) two main points that structure the analysis.
First, this episode-'included three key parts (as discussed below, parts #1 and #2 happened “pretty simultaneously”):
#1: The officers’ shining the lights, exiting their car, and approaching Mr. Roberson’s ear.
#2: Mr. Roberson’s furtive stuffing motions.
#3: Mr. Roberson’s compliance with the officers’ orders to show his hands.
The Government does not contest the district court’s determination that the officers lacked reasonable suspicion at #1. Mr. Roberson, in turn, does not dispute the court’s conclusion that the officers had reasonable suspicion to seize Mr. Roberson at #2 when he made his furtive stuffing motions.[11] The parties agree Mr. Roberson *1125 had submitted to a show of authority at least by #3 when he showed his hands on the steering wheel. The question is whether he submitted earlier than #3. Mr. Roberson argues the.show of authority arose at #1, see Aplt. Br. at 19, and that he was seized “immediately” at #1 by submitting to the officers’ initial show of authority by not running or driving away, id. at 23. I disagree. Under the totality of the circumstances, a reasonable officer would not have viewed Mr. Roberson as submitting “immediately” because he started his furtive motions in response to their show of authority. A reasonable officer would have thought Mr. Roberson submitted only when he complied with the officers’ commands and put his hands on the steering wheel at #3.
Second, three aspects of Mosley are especially relevant. First, both here and in Mosley, in .response to law enforcement’s show of authority, the defendants made furtive motions that were directly contrary to submission. Second, in Mosley, the defendant briefly hesitated before making furtive motions, whereas Mr. Roberson did not hesitate. Third, in both cases, the defendants' did not manifest submission until they complied with the officers’ orders to show their hands.
Third, two main points frame the following application of law to the facts. First, when viewed in the light most favorable to the Government, the evidence here is at least as strong to affirm as in Mosley. Second, whether and when an individual submits to a. show of authority turns on the perception of a reasonable officer, not that of the individual. Salazar, 609 F.3d at 1065. .
2. Application
First, viewed in the light most favorable to- the Government, Moran, 503 F.3d at 1139, the evidence at the suppression hearing showed that Mr. Roberson did not hesitate before furtively hiding his gun in response to the lights and the officers’ approach. Rather than remain passively seated, he made furtive stuffing .motions beneath-his seat consistent with hiding or retrieving a gun. See ROA, Vol. III at 105 (district court’s finding that the stuffing motions were consistent with concealing or retrieving a gun), Sergeant Stephens testified that the officers’ exiting their car and Mr. Roberson’s stuffing motions happened “pretty simultaneously.” ROA, Vol. III at 40. This, means that-no time elapsed between- #1 (the show of authority), and #2 (Mr. Roberson’s furtive stuffing motions). This evidence is stronger than in Mosley, where the defendant “hesitated briefly” before his furtive motions, 743 F.3d at 1321.
Mr. Roberson’s argument that he submitted and was seized “immediately” at #1 by not attempting to run or drive away, Aplt. Br. at 23, is contrary to the record, which shows there was no timé gap between the show of authority at #1 and his furtive motions at #2 to signal his submission to the officers. Mr, Roberson therefore was not seized “immediately” as he contends.
Second, although Mr, Roberson or a reasonable person in his position may have believed he was submitting to the police “immediately” at #1, our precedent makes clear that it is the reasonable officer’s perspective that counts in analyzing whether Mr. Roberson submitted. See Salazar, 609 F.3d at 1065. A reasonable officer would not have concluded that Mr. Roberson' submitted ‘to authority until he complied with the command to show his hands at #3.
Commensurate with the officers’ initial show of authority consisting of the bright lights and approaching the car, Mr. Roberson could have attempted to run or drive away to manifest his lack of submission. *1126 But Mr. Roberson and the dissent wrongly contend that these were the only ways to refuse to submit. See Dissent at 1139-40 (reasoning that Mr. Roberson submitted immediately by remaining seated, rather than fleeing on foot or driving away); Aplt. Br. at 22 (arguing the same).
In Mosley, we recognized that furtive motions in response to officers’ show of authority reflect lack of submission. See 743 F.3d at 1327 (stating that the furtive motions did not manifest submission but were instead “directly contrary to the officers’ commands” shouting “hands up”). Mosley thus supports that Mr. Roberson’s immediate furtive motions at #2—which were consistent with reaching for a gun under his seat and continued even after the officers shouted their commands to show his hands—were actions a reasonable officer could view as contrary to submission. And as previously noted, Mr. Roberson does not challenge the district court’s conclusion that the officers had reasonable suspicion to seize him at #2 when he started making his furtive stuffing motions. A reasonable officer would not have thought Mr. Roberson submitted until he stopped his stuffing motions and complied with the officers’ orders by showing his hands on the steering wheel at #3—at which time the officers had reasonable suspicion to seize Mr. Roberson.[12]
⅜ $ ⅜ ⅜
The foregoing analysis comports with Mosley, where we held that a brief hesitation before engaging in furtive motions would not have signaled submission to a reasonable officer. See Mosley, 743 F.3d at 1325 (“To comply with an order to stop— and thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority, for there is no seizure without actual submission.”) (brackets and quotations omitted). And, as the record supports, Mr. Roberson did not hesitate before engaging in non-submissive furtive motions.
3. The Dissent
The following responds to the dissent’s remaining arguments.
First, the dissent argues the foregoing analysis “disregards Brendlin’s guidance” that, “depending] on what a person was doing before the show of authority,” “an individual can submit to a show of authority through passive acquiescence.” Dissent at 1139 (quoting Brendlin, 551 U.S. at 255, 261-62, 127 S.Ct. 2400). The dissent errs by overlooking a critical distinguishing fact between Brendlin and this case, and by disregarding our circuit’s binding precedent.
Quoting Brendlin that “passive acquiescence” can consist of remaining seated inside a car, Brendlin, 551 U.S. at 255, 262, 127 S.Ct. 2400, the dissent would hold that Mr. Roberson “immediately submitted to the officers’ command through passive acquiescence by remaining seated in his parked car in response to the command to stay put, rather than attempting to flee on foot or run over the approaching officers by driving away.” Dissent at 1139-40. The problem with this argument is that, although Mr. Roberson remained inside the car like the Brendlin defendant, he did not acquiesce. He instead immediately made furtive motions consistent with reaching for a gun. See ROA, Vol. Ill at 105. The dissent “see[s] no reason to consider” Mr. *1127 Roberson’s stuffing motions, Dissent at 1141-42, but Mosley holds that furtive stuffing motions are inconsistent with submission.[13]
Although the dissent criticizes this opinion’s use of Solazaos “reasonable officer” test and “question[s]” our court’s “basis for adopting such a test,” see Dissent at 1140-41, it agrees that Salazar binds this court, id. at 1140. The dissent’s actual quarrel seems more with our circuit’s precedent, not how this opinion follows it.[14]
Second, the dissent argues this opinion “overlooks a critical distinction between the show of force here and the show of force in Mosley,” id. at 1141, but its argument is not well-grounded.
The dissent first notes that Mr. Mosley was caught by surprise when the officers approached, id. at 1140-41 (citing Mosley, 743 F.3d at 1321), whereas Mr. Roberson “had at least a few seconds to process that several patrol cars had entered the parking lot, one patrol car had pinpointed him by shining bright lights on his car, and two officers were aggressively approaching his car.” Id. at 1141. The record shows otherwise. The dissent’s assertion that Mr. Roberson perceived “several patrol cars” entering the parking lot conflicts with the district court’s finding that Mr. Roberson was not yet aware of any patrol car other than that of Sergeants Stephens and Anderson at the initial show of authority.[15] The dissent also lacks record support for its supposition that Mr. Roberson was not caught off guard, or that he had “at least a few seconds to process” the officers’ actions before making his stuffing motions. Id.[16]
*1128 Even assuming Mr. Robei’son had paused after becoming aware of the officers’ show of authority and starting his stuffing motions, any pause would have been a few seconds at most. This is so because, taking the evidence in the light most favorable to the Government, the stuffing motions were only a part of the 10 to 15 seconds between the time the officers exited their car (#1) and smelled marijuar na (#3).[17] Mosley supports that any such brief hesitation between perceiving a show of authority and making furtive stuffing motions would not signal submission to a reasonable officer, 743 F.3d at 1321, 1327.
The dissent second observes that the officers in Mosley explicitly and immediately commanded Mr. Mosley to show his hands, whereas the officers here commanded Mr. Roberson to show his hands only after he started his stuffing motions. Dissent at 1140-41. The officers’ initial command to Mr. Roberson, in the dissent’s view, was an “implicit” one to “stay put.” Id. at 1141. But any difference in the nature of the officers’ commands does not materially distinguish Mosley. The critical feature in both cases is that neither Mr. Mosley nor Mr. Roberson complied with those commands. Instead, they reacted by engaging in furtive stuffing motions that, from a reasonable officer’s perspective, evinced noncompliance with the officers’ commands. Because the defendants’ reactions to. the officers’ commands were the same, Mosley is analogous for the purpose of analyzing whether Mr. Roberson submitted.
III. CONCLUSION
'With Judge Hartz’s concurrence and this opinion, a majority of this panel affirms the district court’s order denying Mr. Roberson’s motion to suppress.

. Takedown lights are bright lights that allow police officers to see persons and objects illuminated by the lights and make it difficult for persons to see the officers.

. At the suppression hearing, Sergeant Ste *1120 phens testified to seeing a cloud of smoke in the car when it was illuminated, but he did not record the observation in his original police report. Because the Government did not rely on this fact to justify the officers’ conduct, the court did not make a factual finding as to whether this testimony was credible. Neither do I.

. In district court, the parties disputed the location of the patrol car and whether it had blocked in Mr. Roberson's car. The court credited Sergeant Stephens's testimony over Ms. Byers’s, finding the patrol car had not blocked the car. The court's factual finding regarding the position of the patrol car and its credibility assessment of Ms, Byers were not clearly erroneous. See United States v. Jarvison, 409 F.3d 1221, 1224 (10th Cir. 2005) (stating that we- reverse factual findings and credibility assessments only if they are "without factual support in the record” or leave us "with a definite and firm conviction that the district court erred”) (quotations omitted).

. The district court noted Ms. Byers's testimony that the first thing she remembered seeing after the officers shined their lights was Mr, Roberson sitting with his hands on the wheel. The court stated this may not have been inconsistent with Sergeant Stephens's testimony that Mr. Roberson made stuffing motions before putting his hands on the wheel because "she didn’t really look at [Mr. Roberson] until she saw the [officers’] guns.” ROA, Vol. III at 103; see also id, at 77 (Ms, Byers’s testimony supporting that, finding). To the extent the testimony conflicted, the court discounted Ms. Byers’s testimony because her first experience with marijuana, the bright lights, the guns, and the new setting may have affected her perception or memory. The court’s finding that Mr. Roberson did not put his hands on the steering wheel until after maldng the furtive motions was not clearly erroneous. Jarvison, 409 F.3d at 1224,

.The court found that the time between the officers’ exiting their car and smelling marijuana was as little as eight to ten seconds. The court’s finding that the timing was as little as eight seconds is not supported by the record. But its finding that it was as little as ten is supported by Sergeant Stephens's testimony and is therefore not clearly erroneous.

. We said nothing, however, about how long he would have had to sit “still” to constitute an objective submission from a reasonable officer's viewpoint.

. We stated that, unlike Brendlin, where the passenger defendant had no effective way to signal submission before the car was stopped, in Mosley.
the car was already parked when the officers arrived, and [the defendant had an effective way to signal submission—putting his hands up in compliance with the officer’s orders or, at the very least, remaining still without making furtive motions—but he did not do so.
743 F.3d at 1324 n.3.

. In reaching this conclusion, we distinguished United States v. Morgan, 936 F.2d 1561 (10th Cir. 1991). Salazar, 609 F.3d at 1067-68. We explained that the Morgan defendant had submitted to a show of authority, "at least momentarily,” by asking an officer, "What do you want?” before attempting to flee. Id. at 1068 (quoting Morgan, 936 F.2d at 1565, 1567). Unlike Morgan, where a reasonable officer could have viewed the defendant’s brief attempt at conversation as yielding to a show of authority, there was no conversation between the officer and defendant in Salazar. Id. We concluded "the fleeting pause of a moving vehicle” would not show submission to a reasonable officer. Id.
The Sixth Circuit distinguished Morgan on similar grounds when it assessed whether a "momentary pause” without a conversation constituted submission to authority. United States v. Jeter, 721 F.3d 746, 752-53 (6th Cir. 2013) (finding no submission where suspect "momentarily] paused” as officers approached him, then abandoned his bicycle and ran away, without any attempt to converse with the officers).
Other circuits have not taken Morgan’s approach and instead have held that a momentary hesitation and a brief conversation did not amount to submission. See e.g., United States v. Smith, 633 F.3d 889, 893 (9th Cir. 2011) (no submission where suspect “initially hesitated and engaged in short verbal exchange” with police); United States v. Valentine, 232 F.3d 350, 359 (3d Cir. 2000) (no submission when the defendant paused for a few moments and gave his name to officers).

.In his opening brief, Mr, Roberson contends he was seized not only by submitting to a show of authority but also-by'physical force when the officers shined their lights and approached his car. But we have generally required physical touching for a seizure to occur through physical force, Brooks v. Gaenzle, 614 F.3d 1213, 1222 (10th Cir. 2010) (discussing how we interpret Hodari D. as standing for the proposition that "a ‘seizure’ occurs only when a fleeing person is physically touched by police or when he or she submits to a show of authority by police”) (quotations omitted). Mr, Roberson was therefore not seized by physical force.

.The dissent mistakenly equates the opinion's assuming there was a show of authority with ignoring its, nature. See Dissent at 1135. But the analysis here considers how the officers showed their authority and how Mr. Roberson responded.

. Although' Mr. Roberson argues there was no reasonable suspicion from the "onset” of the encounter, Aplt. Br, at 11, he does not challenge the district court's determination that the officers developed reasonable suspicion when Mr. Roberson made his stuffing motions after the officers confronted him.

. Mr. Roberson's attempts to distinguish Mosley are unavailing. For example, Mr. Roberson points out that the officers in Mosley were responding to an anonymous tip, id. at 1321, whereas the officers here had no such tip and were instead conducting a general patrol of Slick Willie’s. But the fact of the anonymous tip did not affect Mosley’s analysis as to whether the defendant submitted. It was instead a fact relevant to whether there was reasonable suspicion to seize the defendant at the time of his submission.

. The dissent notes that in Brendlin, the passenger submitted despite "briefly opening] and then closing] the passenger door” rather than "remaining] frozen in place.” Dissent at 1141-42 n.4 (citing Brendlin, 551 U.S. at 252, 127 S.Ct. 2400). As the dissent recognizes, the Supreme Court stated that such movements could have been either contrary or consistent with submission. Id. (citing Brendlin, 551 U.S. at 258 n.4, 127 S.Ct. 2400). But here Mr. Roberson's actions left no room for debate— he started furtive stuffing motions that Mosley held are directly contrary to submission.

. The dissent posits the Supreme Court's "Mendenhall/Bostick test” “says nothing about analyzing submission from a reasonable officer’s view,” Dissent at 1140 (referring to United States v. Mendenhall, 446 U.S. 544, 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) and Florida v. Bostick, 501 U.S. 429, 435-36, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)), and criticizes United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997), which Salazar cited in support of the reasonable officer test, Dissent at 1140-41. But none of this changes that Salazar, and for that matter Mosley, are binding circuit precedent.
Whatever merit there may be to the dissent’s critique of Tenth Circuit precedent, we must follow it “absent en banc reconsideration or a superseding contrary decision by the Supreme Court.” Barnes v. United States, 776 F.3d 1134, 1147 (10th Cir. 2015) (quotations and emphasis omitted).

.The district court found that, apart from Sergeants Stephens and Anderson’s car, "[t]here [was] no basis in the evidence for a finding that the other squad cars that pulled into other parts of the parking lot contributed ... to the defendant’s perception of his situation.” ROA, Vol. I at 51 n.3. The dissent regards this finding as a legal conclusion. Dissent at 1136. The district court did not think so, and neither do I.
I disagree with the dissent that, if the finding was factual, it was clearly erroneous. Id. at 1137 n.l. The dissent points to Ms. Byers’s testimony that she saw other patrol cars arrive after the first patrol car with bright lights appeared. Dissent at 1137 n.1 (citing ROA, Vol. III at 107-08). But the dissent overlooks Ms. Byers’s further testimony that the "first car” she saw was the one with "the bright lights on,” ROA, Vol. III at 63 & 65, and that she "didn’t see the [other officers] in the back until [she] was detained,” which occurred when Mr. Roberson had already submitted by putting his hands on the steering wheel, id. at 66-67. Viewing her testimony in the light most favorable to the Government, as we must, the court’s finding was not clearly erroneous.

. Ms, Byers's and Sergeant Stephens’s testimony cuts against the dissent’s assertions that Mr. Roberson was not startled and perceived the police presence before they shined their lights. See ROA, Vol. III at 76 (Ms. Byers testifying that her attention was "first” drawn to the officers' spotlight that caught her by "surprise[ ]”); id. at 35 (Sergeant Stephens testifying that, from his perspective, Mr. Roberson was "startled’’ by-the officers). There was no contrary testimony.

. Although Sergeant Stephens testified that the timeframe may have been "30 seconds tops," he testified Aat it was ”[p]robably” 10 or 15 seconds. ROA, Vol. III at 50. The evidence viewed in the light most favorable to the Government is Aat Ae timeframe was only 10 to 15 seconds.